## Case No. 13,929.

THOMASSEN et al. v. WHITWELL.

[9 Ben. 403;[1] 24 Int. Rev. Rec. 123.]

District Court, E. D. New York. March, 1878.[2]

SHIPPING—LIMITATION OF LIABILITY—FOREIGNERS — UNITED STATES STATUTES — LAW MARITIME — PRACTICE — FORFEITURE OF RIGHT TO LIMITATION.

1. The statutes of the United States, limiting the liability of ship-owners (Rev. St. §§ 4282–4289), cannot be invoked in an action between foreigners, arising out of a collision between foreign vessels in waters beyond the territorial limits of the United States, when none of the owners of either vessel are residents of the United States.

[Followed in Churchill v. The British America, Case No. 2,715. Cited in The John Bramall, Id. 7,334; Re Long Island, etc., Transp. Co., 5 Fed. 620.]

2. Where a collision occurred on the high seas between a Norwegian and a British vessel, neither the law of Norway nor the law of Great Britain can be resorted to by the courts of admiralty of the United States to determine the defendant's liability. The law of the seas—the law maritime according to the law of nations—furnishes the rule by which to determine the extent of such liability.

3. By the law maritime the liability of the ship-owner is limited to the value of the ship and freight, and the necessity of an abandonment thereof, in order to entitle the ship-owner to the benefit of the exemption from further liability, follows from the rule.

4. Where the defendant answering to the merits, by his answer also offered to surrender his vessel to the libellants, and upon the trial tendered a written surrender of his interest in the vessel as of the date of the collision, i. e., March 25, 1876: Held, that the surrender of his interest, as tendered in the answer and upon the trial, was in such form and at such time as under the maritime law to effect his release from liability to the libellants.

5. Where, after the collision, the vessel of the defendants, while pursuing her voyage, was stranded, and was afterward sold as a wreck at public auction by direction of her owners, and was delivered to other parties after the filing of the libel, but before the answer was filed: Held, that the defendant must, by the general maritime law, be held to have intentionally waived his right to claim exemption from personal liability beyond the ship and her freight, and cannot obtain the limitation of liability which he seeks.

[This was a libel in personam by Jens Thomassen and Julius Smith, owners of the Norwegian bark Daphne, against Mark Whitwell & Co., owners of the British steamship Great Western, for damages sustained by the bark in a collision with the steamship. The case was first heard upon application to dismiss for want of jurisdiction, on account of all parties being aliens. The application was denied. Case No. 13,928.]

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

[2] [Affirmed in 12 Fed. 891. Decree of circuit court affirmed by supreme court in 118 U. S. 520, 6 Sup. Ct. 1172.]

Henry T. Wing, for libellants.

Foster & Thomson and R. D. Benedict, for claimant.

BENEDICT, District Judge. This is an action in personam, brought against the defendant as an owner of the steamship Great Western by the owners of the bark Daphne, to recover for injuries done to the bark Daphne by a collision with the Great Western that occurred on the 24th day of March, 1874. The evidence as to the circumstances under which the Great Western collided with the Daphne has left no room to contend that the accident arose from any other cause than the negligence of the Great Western, and accordingly no attempt has been made to dispute the liability of the defendant. The question made pertains to the extent of that liability. The facts out of which this question arises are as follows:

The collision which caused the damage sued for occurred on the high seas, and outside of the territorial waters of any nation. Both vessels were foreign to the United States, the one being a Norwegian bark, the other an English steamer. None of the owners of either vessel are residents of the United States. The defendant is a British subject and the libellants subjects of Norway and Sweden. The steamer sustained no damage from the collision, and after the accident proceeded on her voyage toward the port of New York, to which port she was bound; but before reaching her destination she stranded on Fire Island beach, and was afterward sold as a wreck at public auction by direction of her owners. Various parties were purchasers at this sale, and a considerable part of the proceeds, some $1,200, is in the hands of the agents of the owners in New York. The total amount realized from this sale of the steamer is much less than the sum claimed for the damage caused to the Norwegian bark; but the value of the steamer prior to her stranding far exceeded that sum.

The defendant, who was brought into court by a foreign attachment to answer the demand of the owners of the Norwegian bark, in his answer, offers to surrender the steamer to the libellants, and upon the trial tendered a written surrender of the defendant's interest in the steamer and her freight, as of the date of March 25, 1876. Upon these facts it is contended, on behalf of the defendant, that he is exempt from liability to the libellants for the collision in question.

This contention presents, at the outset, a question as to the effect of the statutes of the United States relating to the liability of ship-owners (Rev. St. U. S. §§ 4282–4289) upon the rights of the parties before the court.

An examination of these provisions of the statute renders it quite plain that no effect can be given them in an action like the present between foreigners, arising out of an oc-

currence that took place beyond the territorial limits of the United States. The statute contains no language to indicate an intention to give it an extra territorial effect, and every presumption is against such an intention. A court of admiralty, which is in a proper sense an international court, "one of the functions of which, and not the least important, is to administer international justice in maritime suits between foreigners" (Dr. Phillimore), certainly in the absence of express language to that effect, would not be justified in enforcing against foreigners the provisions of a municipal statute of this character in a case like this. Says Vice-Chancellor Wood, speaking of the law of England relating to the liability of ship-owners: "I should entertain great doubt, to say the least of it, as to whether or not a foreign ship, meeting on the ocean with a British ship and being damaged by it, could be deprived of its rights by any act of parliament." General Iron Co. v. Schurmann, 1 Marit. Law Cas. 62.

It has been suggested in regard to statutes of this description that effect may be given to them in all cases upon the ground that they relate to the remedy. But manifestly such is not their true nature. The Amalia (Dr. Lushington) 1 Marit. Law Cas. 361.

In determining the case of The Amalia just cited, the privy council, noting the case of Cope v. Doherty [4 Kay & J. 367], where the collision was on the high seas between two American vessels, one of which sought in an English court to take the benefit of the English statute, say: "It seems extraordinary that any question should have ever been raised upon a case of this description;" and although they give the English owner the benefit of the English statute limiting the ship-owner's liability in the case before them, where the collision then in question occurred upon the high seas between an English and a foreign vessel, it is upon the sole ground of the words of the English statute, as shown by Dr. Phillimore in the case of The Halley, 2 Marit. Law Cas. 562.

The present case is different, because here, both parties being foreigners, the ship-owner does not invoke the statute, but the libellant invokes a statute of the United States to determine the extent of the ship-owner's liability, and that statute contains no language that will admit of the supposition that it was intended to apply to foreigners out of the jurisdiction.

It being impossible therefore to find, in our own statute law, the rule by which to determine the extent of the defendant's liability, it may next be inquired whether resort can be had to the law of the nation to which the parties belong; and here the answer seems plain. The parties are subjects of different nations, and no good reason can be given for resorting to the law of one of these nations rather than the other. The defendant, who is a British subject, has not brought himself within the control of the laws of Norway and Sweden, nor have the libellants the right to ask this court to apply in their behalf the law of Great Britain, the act, out of which the defendant's allegations arose, not having been done either in Norway or England. I am aware that it has been sometimes attempted in determining questions of this character to call in the aid of that fiction of law by which a ship, wherever she may be, is for certain purposes deemed to be a part of the land from which she hails. In this view, it could be here contended on the one hand, that the obligation of the defendant should be deemed to have been incurred in England because the acts of negligence which render him liable were acts done in the navigation of a British ship; while on the other hand it could be urged that the blow which did the injury was delivered on a Norwegian vessel and the obligation resulting from the blow must therefore be deemed to have been incurred in the kingdom of Norway and Sweden. Neither of these positions has been assumed by the advocates in this case; and it doubtless appeared to them as it does to me, that it would be carrying the fiction too far to decide that the collision in question occurred in either of the countries mentioned.

It seems quite plain that the defendant, as he was not in fact on board the Norwegian vessel, was neither in fact nor in law within the jurisdiction of Norway and Sweden at the time of doing the acts complained of; and if the law of England could be applied upon the ground that the acts of negligence were done upon an English vessel, it would be of no benefit to the defendant, as by that law the value of the vessel just before the collision is taken as the limit of the ship-owner's liability. Reg. v. Keyn, 2 Exch. Div. 63.

The nature and extent of the defendant's obligation must indeed be determined according to the law of the place where he incurred the obligation, and that place was not in England nor in Norway, but on the high seas. The law of the seas, "the law maritime according to the law of nations" (Sir John Nicholl, The Girolamo, 3 Hagg. Adm. 177), is therefore the law to be here administered.

There is a maritime law of the United States consisting of statutory provisions, and such of the customs of the sea as the courts may see fit to adopt. The Lottawanna, 21 Wall. [88 U. S.] 573. There is also a general maritime law in force on the sea which is part of the law of nations, and consists of certain rules applicable to affairs of the sea, which have been so often acted upon, and by so many different nations, that they are deemed to have been assented to by all, and according to which all persons going on the sea may justly be supposed to have agreed to be judged in respect to acts there done. This law courts of admiralty by the comity of na-

tions are in a proper case authorized to administer. See the case of The Scotia, 14 Wall. [81 U. S.] 187, where the international navigation rules were applied as having become part of the maritime law operative on the high seas by reason of the assent of most maritime nations, as expressed by the enactment of the rules.

The inquiry, therefore, arises, whether there be any rule of the general maritime law by which the defendant's liability is limited; for, if not, his liability upon principles of natural justice must be held to extend to the full measure of the damages occasioned by his wrongful act. As to the existence of a rule of the general maritime law upon the subject under consideration, there is no room for controversy, it having been ascertained and declared by the supreme court of the United States in the following language: "By the maritime law, the liability of the ship-owner was limited to his interest in the ship and freight, for all torts of the master and seamen, whether by collision or anything else, and sometimes even for the master's contracts; and his liability was so strictly limited that he was discharged by giving up that interest or by the vessel being lost on the voyage; and the maritime courts found no difficulty in carrying this law into execution." Norwich Co. v. Wright, 13 Wall. [80 U. S.] 119. The rule of the maritime law thus recognized by the supreme court of the United States has also been recognized by the legislation of many foreign countries, viz: Portugal, Holland, Hamburg, Denmark (Code of 1683), Sweden and Norway (Ordinance of 1667), Russia, the two Sicilies, Malta, in the Lombardo-Venetian Kingdom, Sardinia, the countries governed by the Ordinance of Bilboa,—that is, Mexico and the republics of South America,—and by Prussia. The rule can, therefore, well be applied here, as an existing rule of the general maritime law, upon the same ground that the international navigation rules were applied in the case of The Scotia above referred to. "In matters affecting, the stranger or foreigner, the commonly received law of the whole commercial world is more assiduously observed, as in justice it should be." The Lottawanna, 21 Wall. [88 U. S.] 572. To the same effect is the remark of Dr. Phillimore when in deciding the case of The Halley, he says: "If, therefore, this collision had taken place upon the high seas, it must, upon general principles, have been adjudicated according to the lex maris."

The question presented in the case of The Halley related to the extent of the ship-owner's liability for the damages arising from a collision; and the opinion in that case contains observations which afford support to the position that upon this subject the rule is furnished by the Roman law, according to which the only limit of liability would be the extent of the damage. But the case then before the court was not one of a collision on the high

seas; and the rule applicable to a collision of that description is plainly expressed in the language above quoted. As pointed out by Judge Ware in the case of The Rebecca [Case No. 11,619], by most if not all of the nations of Europe an important qualification of the general rule of the Roman law was admitted in the case of the ship-owner, namely that the extent of his liability was limited to the value of the ship and freight. It is only as thus qualified that the rule of the Roman law can be said to be the rule of the maritime law. Norwich Co. v. Wright, 13 Wall. [80 U. S.] 119.

The right to abandon the ship and freight, and thereby to be released from liability, and the necessity of such an abandonment, in order to be entitled to the benefit of the exemption, obviously follow from the rule. There remains, therefore, in this case, only the question whether the defendant has waived his right to claim exemption, and if not, whether the surrender of his interest, as tendered in his answer and upon the trial, was in such form and at such time as to effect his release from liability to the libellants. A citation or two from Caumont (Dictionnaire de Droit Maritime) will show authority which renders easy the decision of these questions. Says Caumont (title "Abandon." 87), "on principle, since the law fixes no limit of time for the surrender, it follows that the ship-owner, as long as he has not renounced his legal right expressly or tacitly, can make this surrender at any time and at any state of the cause, after the ship has foundered (Brussels, 31st of July, 1858), or been totally lost (Paris, May 24, 1862), or seized (Marseilles, June 30, 1828), or sold after a misfortune at sea (Bordeaux, Aug. 9, 1859)." Again, in section 91, decided (1) * * * and (2): "that the law fixing no limit for the exercise of the right of surrender, it ought to be admitted, as long as no fact has intervened from which one can infer that the owner has renounced the exercise of his right. Such a renunciation cannot be inferred from a defence on the merits, if the surrender has been proposed by the same pleading as the defence on the merits." Cass., 31 Dec. 1856. The sale above alluded to must be a judicial or official and adverse sale, for the same author, in section 93, says: "The surrender may be proposed after a judicial sale. In authorizing the owner to free himself by a surrender, the legislature has wished to preserve the land fortune of the owner. This privilege is principally useful to him when events have made the expedition profitless. But the sale of the ship must be the consequence of fortune of the sea. If the sale was the consequence of the choice of the owner, the intention to renounce the right to surrender may be inferred." Bordeaux, Aug. 9, 1859.

These statements of the rule of the maritime law as applied in the maritime courts

of France may with safety be taken to show the understanding of the rule by maritime nations; and they will, I think, be found to be supported by accredited writers, whose works courts of this country have often considered to furnish sufficient evidence of the law.

According to the law, as above stated, it cannot be held that the defendant's tender of his interest in the vessel was defective in form, or having been made in the answer was too late in time, provided the right to abandon had not been lost, and an abandonment was then possible. "As to the form of surrender, the law has made no provision. It may be made by declaration before a notary signified to the creditors, or by a simple notice sent by an officer (exploit d'huissier), or even in the plea made by the owner to defeat the action constituted against him." Des Capitaines, Maitres, et Patrons, by Eloy and Guinand, p. 722.

But there remains a fatal difficulty for the defendant, viz. that when he made his tender he had no interest in the vessel to abandon. The undisputed evidence is, that on April 1, 1876, after the filing of the libel in this cause, and before the filing of the answer, the vessel (there was no freight) was sold by the defendant, and then passed into the possession and ownership of other parties. The vessel was not condemned and sold by process of law, nor was she abandoned to the underwriters and sold by them: but the sale was a voluntary act of the owners, and it transferred the ownership as well as the possession of the property to third parties, and without notice to these libellants. Even the proceeds have been in part made use of. It was not possible, therefore, for the defendant to surrender the vessel when he attempted to do so, for he had then no interest in her capable of being surrendered. This sale of his vessel, under such circumstances, not only warrants, but compels the inference, that there was an intentional waiver of the right to claim exemption from personal liability beyond the ship and her freight, and renders it impossible for the defendant now to obtain the limitation of liability that he seeks. As to the effect of a sale of the ship by the owner upon his right to exemption, see Bedarride, Com. du Code de Commerce, livre 2. Droit Maritime, tome, 1, §§ 290, 291, 293.

There must, therefore, be a decree in favor of the libellants for the full amount of the damage by them sustained.

[The application of the respondents for leave to file amended answer was subsequently denied. Case No. 13,930. On appeal from the decree of this case, allowing full damages for libellants, it was held that the Great Western was liable for the proceeds of the wreck, amounting to $1,796.14, and a decree given for that amount and interest, and for the costs of the libellants in this court. 12 Fed. 891. Appeal was then taken to the supreme court, where the decree of the circuit court was affirmed. 118 U. S. 520, 6 Sup. Ct. 1172.]