## THE CHATTAHOOCHEE.

### HENDRY et al. v. OCEAN STEAMSHIP CO.

(Circuit Court of Appeals, First Circuit. June 12, 1896.)

#### No. 171.

1. COLLISION—STEAMER AND SAIL—EXCESSIVE SPEED.
   A schooner navigating coast waters, resorted to by the coastwise traffic, and at the same time just on the edge of the route of the Atlantic liners, *held* in fault for going between five and six knots, being substantially her full speed running free, in a fog of such a character that it led to a misunderstanding of signals and courses.

2. SAME—PRESUMPTION—CLEAR FAULT OF ONE VESSEL.
   The rule as to the presumption when one vessel is found in fault by uncontradicted testimony, or is otherwise clearly in fault (The City of New York, 13 Sup. Ct. 211, 147 U. S. 72, and The Oregon, 15 Sup. Ct. 804, 158 U. S. 186), has no application in a case in which the question of fault on each side is for the determination of the court from facts easily ascertainable.

3. SAME—MUTUAL FAULT—APPORTIONMENT OF DAMAGES.
   If, in cases of mutual fault, the damages can ever be apportioned to the different degrees of fault (The Victory, 15 C. C. A. 490, 68 Fed. 395), instead of being equally divided, such rule of apportionment is inapplicable where the fault of each vessel is of precisely the same character, namely, maintaining full speed in a fog, according to the capacity of each for speed.

**4. SAME—LIMITATION OF LIABILITY—HARTER ACT—FOREIGN VESSELS.**

Quære, whether section 3 of the Harter act (27 Stat. 445) was intended to extend to foreign vessels, although, by its letter, it applies to any vessel "transporting merchandise and property to or from any port in the United States."

**5. SAME—MUTUAL FAULT—DIVISION OF DAMAGES—RECOMPENSE OF CARGO DAMAGES.**

The Harter act does not apply in a case of collision by mutual fault, whereby one vessel and her cargo are totally lost, so as to prevent the operation of the general admiralty rule, which allows the other vessel, after paying the entire value of the cargo, to recoup one-half of that amount out of the half damages awarded to the owners of the lost vessel. The North Star, 1 Sup. Ct. 41, 106 U. S. 17, and The Manitoba, 7 Sup. Ct. 1158, 122 U. S. 97, applied.

**6. SAME—PROTECTION OF SEAMEN BY APPELLATE COURT.**

Where one vessel and cargo were totally lost by a collision resulting from mutual fault, and the other vessel, after paying full damages for the lost cargo, was permitted to recoup one-half thereof from the half damages awarded to the owners, officers, and crew of the lost vessel, but the decree was open to the construction that the recoupment was to be pro rata on the sums apportioned to owners, master, and crew, *held* that, in the absence of an assignment of error in respect to the recoupment against the seamen, the appellate court would, of its own motion (seamen being wards of the admiralty), direct that the decree be modified so that the several sums awarded to the mate and crew, who were in no way responsible for the fault of navigation, should be exonerated by, and have priority over, the amounts awarded the owners and master.

Appeal from the District Court of the United States for the District of Massachusetts.

This was a libel in rem by Abram W. Hendry and others, owners, master, and crew of the schooner Golden Rule, against the steamer Chattahoochee (the Ocean Steamship Company, claimant), to recover damages for loss of the schooner, which was sunk in collision with the steamer. The district court found that the collision resulted from mutual fault, and entered a decree for half damages, but also allowing the claimant to recoup from that sum one-half the value of the cargo; the steamer being liable for the full value thereof. From this decree, the libelants have appealed.

Eugene P. Carver (Edward E. Blodgett with him on brief), for appellants.

Chas. T. Russell, for appellee.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

PUTNAM, Circuit Judge. We agree with the findings of fact and the conclusions of the district court in this case. This collision occurred about 4 o'clock on the morning of July 20, 1894, south of Nantucket Shoals, between the steamer Chattahoochee, of 1,887 tons register, an enrolled vessel of the United States, bound from Boston to Savannah, and the British topsail schooner Golden Rule, of about 200 tons net register, deeply loaded with a cargo of sugar and molasses, and bound from Porto Rico to Boston. The Chattahoochee left Boston on July 19th, and, the weather being foggy, she decided to go outside, rather than take the regular course

through Vineyard Sound. The vessels, therefore, while not in the most frequented track, were still in coast waters resorted to by the coastwise traffic. In addition thereto, the master of the schooner testifies that he supposed he was just about out of the line of ocean steamers, meaning by this the Atlantic liners. Considering the prevalence of the fog which occasioned the collision, he could not fairly put it more positively than this. Therefore the vessels were navigating waters to which a due regard for human life requires a strict application of the statutory rule of "moderate speed" in a fog or mist. That there was a fog at the time of the collision, which set in at least an hour before, is not disputed. Its density is. It was a low fog, so that the Golden Rule claims that she saw the masts of the steamer 2,000 feet away prior to the collision. It was probably a surface fog, which the masts of the steamer rose above, but which concealed the schooner. The hull of the schooner was white, which also may have aided to conceal her. But, however this may have been, there was a fog of such character that it led to a misunderstanding of signals and courses, which would have been avoided if either vessel had been proceeding at a moderate speed, and much more so if both vessels had complied with the rule; and this is a practical test that the fog was such as the rule contemplates with reference to the reasonable exigencies of safety. This is illustrated by a consideration of the circumstances of the collision. The wind is said to have been from the southwest. The schooner was headed north by east, one-half east; so she sounded three blasts of her horn as for a sailing vessel with the wind abaft the beam. There can be no doubt that this was heard aboard the steamer as a single blast, as for a sailing vessel on the starboard tack. Consequently, the steamer, hearing the horn on her port bow, went to her own starboard, and reduced her speed four or five miles an hour, which would surely have prevented a collision if the schooner had been on her starboard tack. The steamer heard the signal from the schooner only once; at the most, twice; while, if the vessels had been proceeding at a moderate speed, there would have been time enough for the repetitions of the schooner's horn to have corrected the error arising from the transmission of the blasts, the steamer might have reversed or gone more to starboard, and the collision would have been avoided. A moderate speed on the part of the schooner would have so far extended the time for the steamer's maneuvers, which she commenced promptly, as to have made them successful; and this is one of the main purposes of the statutory regulation on this point. The Zadok, 9 Prob. Div. 114, 115.

The district court found the steamer guilty of excessive speed; and, as she did not appeal, she stands so charged in this court. The schooner was under all sail except the lower half of her square sail. Her rig gave her a very large spread of canvas, which made her fast on the course she was sailing. She was practically free, and her master admits that she was making between five and six knots. Other witnesses claim more. However this may have been, it is very plain that she was making substantially all the

speed she was capable of, and that she could easily have shortened sail materially when she struck the fog, and yet have kept her steerage way, and all the way necessary for all maneuvers which could reasonably have been anticipated.

The schooner refers to The Martello, 39 Fed. 505, as supporting the proposition that her speed was not a contributing fault; but this question is one of pure fact, as to which The Martello, even if it had not been reversed by the supreme court (153 U. S. 64, 14 Sup. Ct. 723), would not assist. The learned judge who decided that case in the circuit court seems, nevertheless, to have reviewed the decisions as to the speed of sailing vessels in a fog; and he summarized them to the effect that, while a speed of four knots at the entrance of New York Bay might not be excessive, yet that, in the instances in which sailing vessels have been held in fault, their speed was "five knots or over." This, on her own admission, was the speed of the Golden Rule.

The schooner also relies on The Morning Light, 2 Wall. 550; but, if that was a case of navigation in a fog, the collision occurred in 1855, and before the international rules of 1864 (now Rev. St. § 4233), the first legislation on the topic.

The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122, is also relied on; but the most claimed for that case is that the vessel involved was sailing only four knots, while the opinion (at page 341, 137 U. S., and page 122, 11 Sup. Ct.) shows that the court did not pass on the point.

The Elysia, 4 Asp. (N. S.) 540, decided in the court of appeal in 1882 (where the vessel was sailing "out in the Atlantic Ocean," about 49° N. and 30° W., "somewhere about five knots, probably less, certainly not more"), if it has any application, has been superseded by the current of later and more authoritative English decisions.

In The Colorado, 91 U. S. 692, 696, the sailing vessel was held not in fault, but the court observed that all her light sails and her foresail had been furled.

In The Zadok, 9 Prob. Div. 114, 117, decided in 1883, Sir J. Hannen found the bark was going "faster than five knots," and he said:

"On this case it is proved that The Zadok, if she had not literally every stitch of canvas set, yet had very nearly all the canvas she could carry; and I come to the conclusion, therefore, that she was going at a speed which, in the circumstances, was not moderate, and, therefore, that she has infringed the rule."

In The Beta, 9 Prob. Div. 134, decided in 1884, in the court of appeal, the master of the rolls said:

"Then we come to the case of The Beta,—the sailing vessel. Article 13 uses the words 'moderate speed,' and the interpretation of these words must depend on the density of the fog, for a speed which may be moderate in a fog through which daylight appears is not a proper speed in a dense fog in which nothing can be discerned. Now, in the present case, speed other than would allow this sailing vessel to keep her steerageway was not moderate. In fact, the Beta had all plain sail set. And then the question arises, was this more than enough to keep her under reasonable control. Our assessors think that it was."

The Beta was condemned as in fault.

The Dordogne, 10 Prob. Div. 6, decided in 1884, by the court of appeal, contains this dictum as to the duty of a sailing vessel after she has heard a fog signal at sea, at page 12:

"To a sailing ship article 18 does not apply, because she cannot stop and reverse, but she ought, if she is under full sail, to take sail off till she brings herself as nearly to a standstill as is possible whilst being under command."

In The N. Strong [1892] Prob. Div. 105, it was said by Jeune, J.:

"Putting all these things together, it seems to me on the whole that the rate of speed which is to be attributed to the sailing vessel is something about four knots. Now, if that is so, was that too much? The law on the subject is quite clear. A sailing ship is entitled to move at such a rate of speed as will enable her to keep properly under command; and I agree with and accept the decisions which go to the effect that what is properly under command varies, and that under some circumstances a vessel may be entitled to go at a higher rate of speed than in others. I agree that whether the position of the vessel is in the open sea, or in a river like the Thames, or off a difficult coast, is a matter which has to be taken into consideration. Now, it appears to me that that is a matter on which the advice of the Trinity Masters is of great importance. I do not profess myself to be able to say what rate of speed a sailing vessel should have in order to keep well under command; but the Trinity Masters have considered the matter, and they tell me that if the speed of the vessel was about four knots, as I have found it to be, they do not think any blame attaches to the vessel for that rate of speed."

We believe we have referred to all the decisions cited by either party, having sufficient authority to guide us; and while, for very apparent reasons, the law does not in all respects apply so strict rules to sailing vessels as to steamers, yet the current of the decisions fails to justify the Golden Rule in proceeding with practically all sail set after she entered the fog, and even after she heard the steamer's whistle.

We will consider some other propositions made in behalf of the Golden Rule. The rule as to the presumption when one vessel is found in fault by uncontradicted testimony, or is otherwise clearly in fault, stated in The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, and in The Oregon, 158 U. S. 186, 197, 15 Sup. Ct. 804, relied on by the schooner, has no application to this case, where the question of fault on each side is for the determination of the court from facts easily ascertainable. The Golden Rule also sets up a claim that admiralty permits an apportionment of damages according to the differing degrees of negligence of the two vessels, instead of in moieties, and cites The Victory, 15 C. C. A. 490, 68 Fed. 395. If that case is to be construed as claimed by the schooner, and if, on the strength of it, we could ever be called on to reexamine the rusticum judicium of the admiralty, which for a long period, in collision cases, has without exception, both in the United States and England, unless in The Victory, divided damages equally where there was mutual fault, we could not be thus called on in the present case, where the fault of each vessel was of precisely the same character, and also practically of the degree of which each was capable according to its capacity for speed, though with neither to the extreme limit thereof.

The Golden Rule was sunk and wholly lost through the collision, with her cargo. The cargo owners were entitled by the general admiralty rules to a decree for their entire loss against the steamer. Both vessels being in fault, the district court, on the well-settled rule, allowed the steamer, which was not damaged, to recoup against one-half of the value of the schooner one-half of the value of the cargo, still leaving a net balance for which a decree was made in favor of the schooner, her officers and crew, after fully satisfying and paying the loss to the cargo owners. In this way the schooner indirectly suffers the loss of one-half of the value of the cargo, though it was by diminution of the damages awarded her. She claims that this was in violation of section 3 of the act of February 13, 1893, c. 105 (27 Stat. 445), commonly called the "Harter Act." We are not referred to any allegations or evidence that the terms of that section were complied with by the owners of the Golden Rule, in that it imposes, as a condition, that the owners shall have exercised due diligence to make the vessel in all respects seaworthy, and properly manned, equipped, and supplied. But passing by this, while the statute in question, by its letter, applies to any vessel "transporting merchandise or property to or from any port in the United States," we are not prepared to determine that its benefits were intended to extend to foreign vessels. If it does, the result of the schooner's proposition would be that a provision of statute historically known to have been intended for the encouragement of our domestic commerce doubles, in the present case, the burden which the general admiralty law imposes on a domestic vessel, for the sole benefit of the owners of a foreign one.

The Delaware, 161 U. S. 459, 471, 16 Sup. Ct. 516, holds that the statute in question has no relation to the claim for the loss of the schooner herself, although its mere letter may be broad enough to cover it. The general purview of the statute limits it to the relations between a vessel and her owners and the cargo aboard and its owners, and merely gives a statutory bill of lading, as was said, partly in terms and partly in effect, in The Delaware. It has no proper relation to claims between colliding vessels, nor to the rusticum judicium of the admiralty, which established the rule by which such claims are divided in case of mutual fault, nor, consequently, to the qualification of that rule by means of which the net damages are diminished by recoupment. The liability to which the statute appertains is that arising from a bill of lading or other contract of carriage; while that with which we are dealing comes from the relations of colliding vessels to each other, and is precisely the same as though the cargo lost had been the lading of a third vessel involved in the collision, but in no way at fault.

The North Star, 106 U. S. 17, 1 Sup. Ct. 41, decided at the October term, 1882, seems to settle the law, at least for all cases like this at bar, where there can be or is no decree for a net balance against the vessel whose cargo is damaged or lost. The substantial effect of that decision is well stated by the reporter in the headnotes, to the effect that the statute limiting liability there under consideration is not to be applied "until the balance of damage

has been struck." The court, at page 22, 106 U. S., and page 41, 1 Sup. Ct., lays down the principle which we have already stated, that, in cases of mutual fault, the assessment of damages is not strictly a setting off of claim against counterclaim, but a mere modification of the usual admiralty rule of the division of them. It uses the following language:

"These authorities conclusively show that according to the general maritime law, in cases of collision occurring by the fault of both parties, the entire damage to both ships is added together in one common mass, and equally divided between them, and thereupon arises a liability of one party to pay to the other such sum as is necessary to equalize the burden."

The court, also, at page 28, 106 U. S., and page 41, 1 Sup. Ct., illustrates the practical inequity which we have pointed out as inhering in the rule claimed by the Golden Rule, when applied to the case at bar, in that it relieves one vessel by doubling the burden laid on the other. It says:

"It would enable the owners of the Ella Warley to obtain full compensation for a moiety of their loss, whilst the owners of the North Star would have to sustain both their own entire loss and half of that of the owners of the Ella Warley, whilst both vessels were alike to blame for the collision. A rule which leads to such results cannot be a sound one."

The North Star was reaffirmed, in the particulars as to which we have considered it, in The Manitoba, 122 U. S. 97, 110, 111, 7 Sup. Ct. 1158. As the statute limiting liability which those cases had under consideration is admittedly of general application, the question could not arise under it which may under some other circumstances arise under the Harter act; that is, whether the benefits conferred by the latter statute can, under any conditions, be extended to affect the relations existing under the general admiralty law between two vessels in collision. It does, however, on any construction of the statute in issue here, go to the extent of meeting the case at bar, in which there is no decree against the vessel whose cargo suffered, as we have already explained.

In The Stoomvaart Maatschappy Nederland v. Peninsular & Oriental Steam Nav. Co., 7 App. Cas. 795, where the house of lords, in 1882, finally laid down the same rule as was determined in The North Star, the lord chancellor, at page 801, said:

"The question is whether there are, in these cases, two cross liabilities in damages, of each shipowner to the other for half the loss which that other has sustained, or only one liability, for a moiety of the difference of the aggregate loss beyond the point of equality."

This question the house answered, as did the supreme court, to the effect that there was in substance "only one liability." Lord Blackburn, at page 819, noticed the inequity flowing from a different answer as we have noticed it, saying:

"This rule [meaning the general admiralty rule of the division of damages] has been stigmatized as 'judicium rusticorum,' and is justified on the ground of general expediency, avoiding interminable litigation at the cost of some inevitable injustice in particular cases. But if the recompense in damages, which the one ship is to make to the other, is to be considered as quite a distinct thing from that which the other is to make to it, this injustice is increased in a manner which is not only not inevitable, but which, as it seems to me, it requires some subtle and technical reasoning to bring about."

We need not, on this part of the case, note the English decisions further, some of which are referred to in Mars. Mar. Coll. (3d Ed.) 138 et seq., and 179. The compulsory pilotage cases are not in point, as the ships on which the pilots were employed were wholly relieved, and the pilots alone were liable. On the whole, we are clear the Harter act affords no ground for any assignment of error in this case.

The entire amount awarded by the decree of the district court to the owners of the Golden Rule, the master, and the other persons serving aboard her will pay only a small percentage of the total sums adjudged to have been their losses. That decree is open to the construction that the various sums worked into this amount are subject to recoupment pro rata. No assignment of error has been made on this account; but, as seamen are the wards of the court in admiralty, we feel justified in noticing this matter of our own motion. The award for each was one-half of the total damages suffered. We make no suggestion with reference to the division of loss in this particular so far as it affects the mate and crew; but inasmuch as we find that as between the Golden Rule and her master, on the one side, and the mate and the crew, on the other, neither the mate nor any of the crew were responsible for any fault in her navigation, we direct that the decree below be so far modified that the several sums awarded the mate and the crew shall be exonerated by, and shall have priority over, the amounts awarded the owners and master.

The decree of the district court must be modified with reference to the matter of distribution between the owners and master of the Golden Rule, on the one side, and her mate and crew, on the other, in accordance with our opinion filed this day; and, with this exception, it is affirmed without interest. The appellee is adjudged its costs in this court; and the case is remanded to the district court for proceedings in accordance with this order.