THE MOUNT HOPE.

GARFIELD & PROCTOR COAL CO. v. McLEAN.

(Circuit Court of Appeals, First Circuit. January 26, 1898.)

No. 213.

1. COLLISION—SCHOONER WITH TOW—SPEED IN FOG.

About four miles an hour, against a heavy sea, in much frequented waters, during a fog, *held* not immoderate speed for a schooner capable of much greater speed, which was able, by reason of being well under control, to avoid actual collision with a tow of unusual length.

2. SAME—LONG TOWS AT SEA—INEFFICIENT MEANS OF COMMUNICATION.

It is negligent navigation for a tug and tows, extending nearly two-thirds of a mile, to go to sea without providing some efficient means of communication from one to the other in emergencies.

Appeal from the District Court of the United States for the District of New Hampshire.

This was a libel in rem by the Garfield & Proctor Coal Company against the schooner Mount Hope, to recover for the loss of a barge, which was cut adrift through fear of collision with the schooner. The district court dismissed the libel (79 Fed. 119), and the libelant has appealed.

Charles T. Russell, for appellant.

Eugene P. Carver (Edward E. Blodgett, on brief), for appellee.

Before PUTNAM, Circuit Judge, and WEBB and BROWN, District Judges.

PUTNAM, Circuit Judge. This case arose out of a series of marine disasters, occurring on September 19, 1896, in Vineyard Sound and near its mouth, as the result of which the barge Fantee was lost; and the schooner Mount Hope was libeled in the court below as legally responsible therefor. The libel was dismissed, and the owner of the barge appealed. The essential portions of the case, substantially as set out by the appellant, are as follows:

The barge Fantee, formerly a bark, was of 580 tons burden, and was equipped with only a leg of mutton mainsail, foresail, and jib. She was employed in the coal-carrying trade, and depended upon towage for her motive power. She was taken in tow at Boston for Norfolk, September 18, 1896, by the tug Orion, and towed to Vineyard Haven, arriving about 1 o'clock a. m., September 19th. The towboat that morning, after arrival, proceeded to make up a tow of three barges, the Lone Star, Macaulay, and Fantee, in the usual manner in such commerce, the Lone Star following the tug with about 150 fathoms of hawser, the Macaulay the Lone Star with about the same length, and the Fantee the Macaulay in similar manner. This made a tow of nearly two-thirds of a mile in length. The tow proceeded on its voyage between 6 and 7 o'clock a. m. on the 19th. At that time the wind was southeast, but it was not foggy. Later in the morning a fog set in, with a strong breeze from the southwest. The tow had slowed down to 3 or 3½ knots an hour. The Mount Hope, a large four-masted schooner, of 989 tons net, was bound to Baltimore. She started from her anchorage at Nobska that morning. At 10 o'clock she found it was getting thick. The wind was canting to the south and west, and the schooner was then on the port tack, heading about northwest. Soon after she came around to the starboard tack, which headed her south by west. She neared the tow, and the Orion heard a faint blast of a fog horn abaft

the starboard beam, but never saw the schooner. The master of the Lone Star heard one blast on the starboard side. The schooner was then about abeam of the Lone Star, and still on the starboard tack. The tow was then heading southwest. The schooner was first seen by the second barge, the Macaulay, off her starboard bow, heading across her bows, and about 125 fathoms away. The whistle was blown on the barge, and her wheel was put hard a-starboard, so that she sheered as much as her hawser would allow, when the schooner tacked, and came close alongside, and then dropped astern. In the meantime, aboard the Fantee, a fog horn was heard on the starboard, and suddenly the schooner loomed up. The hawser had been cut, and the Fantee fell off to head to the northward and westward, which brought the schooner, when first seen from her deck, off her port bow. The schooner crossed from port to starboard within 20 feet of the port bow of the Fantee, and then disappeared in the fog. The Fantee was thus adrift, and with no motive power, except the three small sails intended for use only to steady her. The master let go the starboard anchor, expecting the return of the towboat. He remained at anchor until about half-past 3 o'clock that afternoon. The fog cleared between 12 and 1 o'clock. The master was right in the channel, he had no lee, the glass was falling very low, and, in the exercise of his discretion, he hove up anchor, made what sail he could, and ran before the wind, making for Quick's Hole, in Vineyard Sound. He opened the land to the westward, got into a swift current, and let go both anchors about 5 o'clock. The barge remained at anchor about an hour, tailing on the beach, when the chains were parted by the heavy sea, and she went ashore, the crew being rescued. She broke up during the night, and became a total loss.

This statement must be modified and supplemented in a few particulars. The schooner and all the barges were light. It is not satisfactorily shown that the Mount Hope was under a speed at the critical period of over four knots through the water. This is the testimony of her master and of her executive officer, and, as she was then almost head on, against a heavy sea, as all agree, we think the probabilities are so much with their evidence that it is not overcome. It is apparent that, as she was seen from the Macaulay at a distance of 125 fathoms, the fog was not absolutely dense; and, on the whole, it has not been shown that she was not, under the circumstances, justified in keeping on sail enough to make the maneuvers which she accomplished at the most critical moment. It is claimed that her actual speed was accelerated by the current, but as it also set forward the tug and her tow by substantially the same degree, and, on the courses of the various vessels, in substantially the same direction, this acceleration had no practical effect on the case.

What sail the schooner was carrying is shown by the evidence of her master, as follows:

"Q. What sails did you set? A. We had the spanker, mizzen, main, foresail, forestaysail, jib, flying jib, jib topsail, and the spanker topsail. Q. In other words, you had all sails set except the staysails between the masts, and the spanker and gaff topsails? A. We had the fore, main, and mizzen topsails, three staysails, and balloon jib furled. Q. What sails had you clewed up? A. All three staysails, mizzen, main, and fore topsails, and balloon jib."

The appellant claims that the topsails were not taken in by reason of the fog, but this is an error. The record shows they were taken in twice that forenoon, the last time on that account. The officers of the schooner testify that they exchanged signals with the tug, and heard signals from all the barges, some time before either was visible; but the record does not raise the question whether for this reason the

schooner should not have tacked sooner than she did. The master of the barge testifies that, when he came to anchor, he expected the tug to return for him. She did not return, because she did not know for several hours that she had lost any part of her tow. The master of the barge does not claim to have given any signals to the tug, except by whistling, till he dropped his anchor, which covered a very short period of time, and by afterwards ringing his bell. It does not appear that the barge had any gun, as required by the regulations for distress signals, or that she had provided any efficient means for informing the tug in an emergency.

It is contended by the appellant that the loss of the barge was the proximate result of immoderate speed on the part of the Mount Hope. The judge of the district court found, in substance, that she was not at the time sailing at an immoderate speed, and that, if she were, such speed was not the proximate cause of the final loss of the barge. The appellant relies on The Chattahoochee, decided by us, and reported in 21 C. C. A. 162, 74 Fed. 899. But the circumstances of the present case differ essentially. There the sailing vessel found in fault was making five or six knots, and, what was more material to our decision, she was under all the speed she was capable of, and could easily have shortened sail when she struck the fog, and yet have kept her steerage way, and all the way necessary for all maneuvers which could reasonably have been anticipated. None of these things appear in the case at bar; and, indeed, the Mount Hope was so well in hand that the maneuvers which she did accomplish would have cleared any single vessel, and even any tow of a moderate length. In The Chattahoochee we cited all the decisions which, under circumstances of the kind at bar, apply to sailing vessels under the regulations of 1885, and none of them would justify us in condemning the Mount Hope as in fault.

But this appeal has another aspect of more importance. Here was a tow extending nearly two-thirds of a mile, and therefore of very great length, even for tows of this character. In The Berkshire, 21 C. C. A. 169, 74 Fed. 906, 910, we held that it was beyond our province to condemn tows of this class generally; but in The Gladiator, 25 C. C. A. 32, 79 Fed. 445, while affirming what we thus said, we remarked that we must hold them to extreme care. It was clearly a violation of this requirement for a tug and tow, covering so great a distance, to go to sea without some efficient means of communication from one to the other in emergencies, and the continued separation of the barge from the steamer in this case is to be attributed to the disregard of this reasonable precaution. These conclusions render it unnecessary to consider any other question raised on this appeal. The decree of the district court is affirmed, and the costs of this court are adjudged to the appellee.