## THE MIDDLESEX.

(District Court, D. Massachusetts. June 13, 1916.)

Nos. 1043, 1336, 1335, 1432.

1. COLLISION ⬦82(2)—FAULT—EXCESSIVE SPEED IN FOG.
   A speed of four knots through the water, by a long and heavily laden schooner at night in a fog, *held* not excessive, such speed being necessary to give her steerageway.

2. COLLISION ⬦81—SCHOONER AND STEAMSHIP—WARNING SIGNALS IN FOG.
   That a schooner at sea did not sound her whistle or exhibit a flare at night in a dense fog *held* not a fault contributing to a collision with meeting steamship, where she was sailing free and her fog horn was sounded at proper intervals.

3. DEATH ⬦13—WRONGFUL DEATH ON HIGH SEAS.
   State statutes in force at the home ports of the vessels, giving a right of action for wrongful death, do not authorize a recovery for death due to collision on the high seas.

4. DEATH ⬦23—CONTRIBUTORY NEGLIGENCE.
   The captain of a schooner drowned when his vessel was sunk in a collision at sea *held* on the evidence not chargeable with negligence for failing to get into a boat when requested to do so by the mate.

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suit by the Russell Company against the steamer Middlesex. Intervening petition of Edmund Winfield and Edward Lawrence, and libels by Mary E. Thomas, administratrix of the estate of John Thomas, by Frederick Foster, administrator of the estate of John W. Cook, and by James H. Dooley, administrator of the estate of Arthur Carberry, against the Coastwise Transportation Company. Decree for interveners Winfield and Lawrence, and dismissing libels in the other suits.

Case No. 1043:
Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for claimant.
Lewis, Adler & Laws, of Philadelphia, Pa., and Frederick Foster and Warner, Stackpole & Bradlee, all of Boston, Mass., for libelant and petitioners Winfield and another.

Case No. 1336:
Lewis, Adler & Laws, of Philadelphia, Pa., and Frederick Foster, of Boston, Mass., for libelant.
Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for respondent.

Case No. 1335:
Lewis, Adler & Laws, of Philadelphia, Pa., and Frederick Foster, of Boston, Mass., for libelant.
Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for respondent.

Case No. 1432:
Frederick Foster and Sawyer, Hardy, Stone & Morrison, all of Boston, Mass., and Lewis, Adler & Laws, of Philadelphia, Pa., for libelant.
Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for respondent.

MORTON, District Judge. These cases grow out of a collision between the steamer Middlesex, owned by the Coastwise Transportation Company, and the five-masted schooner George P. Hudson, which occurred on 11th July, 1914, at about 10:20 p. m., on the high seas, at a point about six miles eastward of Pollock Rip Slue lightship. There was a dense fog at the time. The Hudson sank almost immediately; her captain and two of her crew were drowned. The proceedings now before the court are to recover damages for their deaths, and damages for personal injuries received in the collision by two surviving members of the Hudson's crew. The death claims are presented by three separate libels in personam against the owner of the Middlesex; the claims for personal injuries by an intervening petition in the orignal libel in rem brought against the steamer by the owners of the schooner and her cargo. No claims for loss of property of any sort are now before the court. No fault is charged against either vessel in respect to lights. It is conceded by the claimant that the steamer's speed, which was six or seven knots an

hour at least, was excessive, and that she was at fault in respect thereto.

The principal questions are: First, whether the schooner was at fault for excessive speed and failure to give proper warnings of her presence; and, if so, second, whether such fault on the part of the schooner diminishes the damages if otherwise allowable; and, third, in the death cases only, whether damages can be recovered against the steamer for loss of life.

[1] As to the schooner's speed: She was bound north, running free with the wind over her port quarter. All her lower sails and most of her topsails and jibs were set. She was a long vessel, heavily loaded, and deep in the water. It is difficult to form a satisfactory conclusion as to her speed at the time of the accident. Her crew all testify, in substance, that she had little more than good steerageway—perhaps three or four miles an hour through the water—and this is to some extent corroborated by the nearly unanimous testimony that the wind was light, and by the fact that tackles had been fastened to some of the booms to keep them from swinging in. On the other hand, it is clear that in the two and a half hours preceding the collision the schooner had come a distance of about twelve nautical miles—an average speed of about five knots. About one knot an hour was due to the favoring tide, so that her speed through the water averaged about four knots. It is contended by the claimant—the argument being based on a reading of the log and an estimate of the time when the reading was made, testified to by Williams, the mate of the schooner—that within the hour preceding the collision she had covered about seven miles. If so, her speed was certainly immoderate. The argument assumes that the distance from the whistling buoy to the point where the reading was made was as indicated by the log. In fact it was that distance, plus the drift of the tide, which would not show on the log. Williams did not take the time when he read the log, and there is the possibility of substantial error on that important point. There is nothing to show any freshening of the wind after that time or any other reason for increased speed in the last hour before the collision.

I am not satisfied, on the evidence, that the schooner was making at the time of the collision more than her average speed for the two and a half hours immediately preceding, i. e., about four knots per hour through the water, and about five knots over the ground; and the question is whether this was excessive. Of course, a sailing vessel cannot stop and reverse like a steamer. Her only method of avoiding obstacles ahead is by a change of course. Below a certain speed, a long, heavily laden vessel like the Hudson loses almost completely her ability to maneuver. She must maintain such speed—and, under the circumstances here shown, such speed only—as will enable her to change course effectively if danger arises. The point at which that rate is exceeded by any particular vessel at any given time is a matter of judgment, depending on many things. Even with steamers it is not uniform; much greater differences must be allowed for in sailing vessels. It devolves upon the respondent

to establish that the Hudson's speed was immoderate and in my opinion it has failed to do so. In The Chattahoochee, 173 U. S. 540, 19 Sup. Ct. 491, 43 L. Ed. 801, s. c. 74 Fed. 899, 21 C. C. A. 162, relied on by the respondent, the speed through the water, on which ability to maneuver depends, was at least two or three knots greater, and the schooner was smaller and presumably quicker in action.

[2] It is also urged that the Hudson should have shown a flare-light as the steamer approached, or have blown danger signals on her own steam whistle, in order to give additional warning of her presence and location. As to blowing the whistle, I think that would have tended rather to confuse and mislead than to assist the approaching vessel. The schooner was certainly not at fault for failing to do it. As to the flare, while I think that an unusually careful master would perhaps have displayed one, I cannot say that the course and distance of the on-coming steamer were so apparent to the men on the schooner that they were required to do so in the exercise of prudent seamanship. Additional warnings of this character are intended to be used either to attract the attention of an approaching vessel which apparently has overlooked the vessel resorting to them, or to warn an approaching vessel when she cannot otherwise be expected to locate accurately the place of the vessel showing the flare. In this case the schooner had a fog horn which, upon the great weight of the testimony, was a suitable one, and was being sounded at frequent intervals after the steamer's whistle was heard. The steamer was approaching from ahead and the schooner's horn was pointed in that direction. It was not evident on the schooner that the horn would not afford to the steamer adequate information of her presence and location. To hold her at fault for not showing a flare would practically amount to establishing a rule that sailing vessels were bound to do so whenever they became aware of danger from a steamer approaching in a fog at night. I do not think that the failure of the schooner to display a flare was a fault on her part.

Various other faults are alleged against the schooner, none of which seem to me to be established nor to require discussion. On all the evidence I find that the Hudson was free from fault in respect to the collision, and that it was due solely to the fault of the Middlesex.

It follows that on the intervening petition of Winfield and Lawrence for personal injuries each petitioner is entitled to a decree for full damages, and the petition must be referred to an assessor to state the damages.

[3] There remains the question whether damages can be recovered for the deaths of Captain Thomas and the two men who were drowned. In this connection certain additional facts must be stated. The Middlesex was owned by a New Jersey corporation; her home port was Boston. The Hudson was owned by a Maine corporation. The laws of New Jersey (Compiled Statutes, vol. 2, pp. 1907, 1908) allow the recovery of damages for death. The laws of Maine also permit recovery for death. (Maine Rev. Statutes 1903, c. 89, §§ 9, 10). The New Jersey statute allows a recovery based upon the loss sustained by the

person entitled to the damages. Under the Maine statute the damages are assessed upon the same principle, but are limited to an amount not exceeding $5,000. There is no such limitation in the New Jersey statute. The two statutes, therefore, differ in a substantial provision. The Massachusetts statutes (Acts of 1907, c. 375, as amended) allow recovery for damages for death caused by negligence, but are based upon an entirely different principle; the damages being awarded not as compensation for loss, but as a penalty assessed with reference to the degree of culpability. No case has gone so far as to allow damages for death on the high seas under the circumstances here disclosed, and I rule that they are not recoverable. The principles involved have been so well and fully considered in the following cases and articles that an extended discussion of them is unnecessary: The Scotland, 105 U. S. 24, 29, 30, 26 L. Ed. 1001; The Belgenland, 114 U. S. 355, 369, 5 Sup. Ct. 860, 29 L. Ed. 152; The Hamilton, 207 U. S. 398, 28 Sup. Ct. 133, 52 L. Ed. 264; La Bourgogne, 210 U. S. 95, 28 Sup. Ct. 664, 52 L. Ed. 973; Thomassen v. Whitwell, 9 Ben. 403, Fed. Cas. No. 13,929; "The Remedy for Death at Sea," by Judge Harrington Putnam, Case and Comment, July, 1915; "An Attempt by Lawyers to Remedy the Law," by FitzHenry Smith, Jr., Case and Comment, July, 1915; "Extra Territorial Marine Torts," by George Whitelock, Esq., 22 Harvard Law Review, pp. 413–418; Benedict, Admiralty Jurisdiction and Practice (4th Ed.) p. 183.

[4] As to the conduct of Capt. Thomas, a further question is raised which, in view of the possibility of an appeal, ought perhaps to be decided. It is contended by the respondent that he was negligent in not getting into the boat when he had the opportunity to do so; that this negligence on his part was the proximate cause of his death; and that for this reason his representative would not be entitled to recover for the death. It seems clear that Capt. Thomas intended to get into the boat later. He was somewhat incapacitated physically, and might well want the boat in such a position as to make it as easy as possible for him to get into it. It was a very great emergency; some members of the crew who were saved were still rushing aft towards the boat when he refused to get into it; the schooner sank with very unusual rapidity, which he probably did not foresee. Considering all the circumstances, I do not think that he was negligent in failing to get into the boat when requested to do so by the mate, although had he taken that advice he would not have been drowned.

Decrees may be entered dismissing the libel in each of the death cases.