## THE MAVERICK.

## AMERICAN MFG. CO. v. THE MAVERICK.

### HALL et al. v. SAME.

(Circuit Court of Appeals, Second Circuit.    January 7, 1898.)

Nos. 35, 36.

1. COLLISION—SAIL WITH STEAMER AND TOW.
   The fact of having a tow upon a hawser does not absolve a steamer from the duty of keeping clear of an approaching sail.    75 Fed. 845, affirmed.

2. SAME—LIGHTS.
   The fact that the light of a schooner, seen on the port bow of a steamer, did not change its bearing, *held* to have been sufficient notice that the schooner was approaching on a crossing course, so that the failure of the steamer to change her course or stop placed her in fault.    75 Fed. 845, affirmed.

3. SAME—CHANGE OF COURSE IN EXTREMIS.
   Alleged error of a schooner meeting a steamer, in going to port instead of to starboard, *held* no ground of liability, where the change was made only after the steamer's failure to alter her course had produced extreme danger of collision.

Appeal from the District Court of the United States for the Eastern District of New York.

These were two libels in rem for collision, filed, respectively, by the American Manufacturing Company and by John W. Hall and others against the steamship Maverick (the Standard Oil Company, claimant).    The circuit court rendered a decree for the libelants (75 Fed. 845), and the claimant has appealed.

Harrington Putnam, for appellant.

Lawrence Kneeland, for appellee American Mfg. Co.

George B. Adams, for appellee Hall.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge.    In any view of the facts warranted by the evidence in the record, the steamship was guilty of fault contributing to the collision; and we are satisfied that she was solely in fault.

The collision took place just after dusk, in a bright night, off the coast of New Jersey, about 10 miles east of Barnegat.    The libelant's schooner, the Lister, was bound from New York to Wilmington, and for two or three hours her course had been S. by W. ½ W.    She was proceeding under full sail, with a fair breeze, at a speed of about five knots an hour.    The steamship Maverick was bound from Philadelphia to Portland.    She was on a course N. E., was towing on a hawser of 185 fathoms a barge 254 feet long, with sails set, and was making a speed of about six knots an hour.    According to the answer of her owner:

"While the Maverick was steering the aforesaid course, the red light of the Ettie H. Lister was made about a mile from the Maverick, and judged to bear about two or three points on the steamer's port bow.    Although it was kept under close observation, no green light was shown; and the

steamer kept her course, supposing the schooner would do the same, as she had the wind free. After an interval of about two or three minutes the red light disappeared, and nothing could be seen of any light of the schooner, although the master used his night glasses. Directly afterwards the red light came in view, bearing about as before; and it was presumed that the schooner would keep her course, and pass safely, red to red. After the schooner had again kept on about a minute, red to red, her red light was shut out again; and by the loom of the sails, which were then seen, she appeared suddenly to change to the eastward, swinging across the bow of the Maverick. The steamer's helm was at once put hard a-starboard, and her engines stopped; two blasts of her whistles blown as a signal to the barge, also, to starboard; but a collision could not be avoided. Although the Maverick answered her helm, and swung to head north by compass, her bow struck the starboard quarter of the schooner at an angle of six or seven points, causing the schooner soon after to sink."

The proofs show very satisfactorily that the schooner did not change her course, after the vessels discovered one another, until they were very close together. Those navigating her saw the steamship's towing lights, and then both her side lights, when she was a long distance away. According to their testimony, when the steamship was a mile and a half, or more, away, both her side lights were seen; then her green light disappeared; after which her red light continued to bear a little upon the schooner's starboard bow, about $2\frac{1}{2}$ points, until very shortly before the collision, when it disappeared and the green light was shown; and thereupon the schooner, hoping to escape collision by assisting the steamship to go under her stern, put her helm hard a-starboard. The wheelsman of the schooner locates the bearing of the steamship's light nearer the stem of the bow, and we are inclined to agree with him, and conclude that it bore somewhere between one and two points on the schooner's starboard bow.

The testimony for the steamship accords with the statements in her answer that she approached the schooner without changing her course until the latter went across her bow, and that the schooner was so near at that time that the steamship put her helm hard a-starboard and reversed her engines. Thus, the case is one where the two vessels were approaching each other for more than a mile, without any change in their relative bearings, on a course by which the red light of the steamship was a little on the schooner's starboard bow, and the green light of the schooner should have shown on the steamship's port bow, until the vessels were so near together that both found it necessary to make a sudden and extreme change of course in the attempt to avoid collision.

As it was the duty of the steamship to keep out of the way of the schooner, notwithstanding she was incumbered by a tow (New York & B. Transp. Co. v. Philadelphia & S. Steam Nav. Co., 22 How. 461),— a duty that required her, in ample time, to take such steps as to prevent the two vessels coming into dangerous proximity to one another, —she can only escape responsibility by showing that she was misled by some fault on the part of the schooner which justified her in assuming that the vessels would pass each other without risk. Her theory is that the schooner showed to her a red light during the period of the approach, until within a few seconds of the collision; and she

had therefore a right to assume, until that time, that the vessels would pass each other safely. The steamship's lookout testifies that he discovered the schooner six or seven minutes before the collision, and at that time saw her red light bearing about three points on the steamship's port bow; that the light was visible and continued in the same bearing for about two minutes, when it disappeared and no light was visible; that in about a minute the red light was shown again for about two minutes, bearing about the same as before; then, that the light disappeared, and he saw the loom of the schooner's sails a couple of lengths of the ship away, a little on the port bow, when the schooner went right across the steamship's bow. The master of the steamship testifies that he first saw the red light of the schooner bearing three points on the steamship's port bow; that after a minute or two it disappeared for a minute or two, and he then saw it again for a minute or two, bearing as before; that he could then see the schooner's sails, and put away his glasses; that he saw her trying to cross the steamship's bow, and he ordered his wheel hard a-starboard. The other testimony from those on board the steamship is to the purport that the red light of the schooner was intermittently shown, always bearing about three points on the steamship's port bow, and that no green light was ever visible from the schooner.

It is obvious, in view of the course of the two vessels, that the red light, if shown at all, should have constantly broadened on the steamship's port bow. The testimony for the steamship could only be true if the course of the schooner had been approximately S. E. by S., instead of S. by W. ½ W.

It will not serve any useful purpose to recapitulate or analyze the testimony introduced in behalf of the steamship for the purpose of showing that the green light of the schooner was not in suitable condition, or burning, while the vessels were approaching. We are satisfied, notwithstanding the somewhat singular story of the schooner's lookout, that it was burning properly, but was extinguished by the shock of the collision. The theory for the steamship involves the hypothesis, not only that the green light did not show, but also that the red light of the schooner was so adjusted that it crossed her starboard bow, and thus misled the steamship. There is no testimony showing that the red light was not properly set and screened, and the contention to the contrary rests wholly upon conjecture. The learned district judge who decided the cause in the court below made the following observations:

"There is a fact proved by the steamship's witnesses which shows her to have had notice that the schooner, which the captain of the steamship supposed to be on a parallel course, was in fact approaching on a crossing course. This fact is that the light which those on the steamship say they saw on the schooner did not change its bearing. This fact is testified to by several witnesses for the steamship, and, indeed, it is alleged in the answer. It gave sufficient notice to the master that the schooner was approaching on a crossing course. The master says he noticed the fact, but never thought about it, and made no change in his course or speed. This was a great fault."

In this observation we concur. It is a familiar proposition that if, while two vessels are approaching, there is no appreciable change in

the bearing of a light from the other vessel, there is risk of collision; and the result of nautical experience has been formulated as a rule of navigation in article 16 of the act of 1890 to prevent collisions at sea (26 Stat. 326). Under the circumstances, the steamship should have checked her speed or stopped before the red light of the schooner finally disappeared. It is doubtful whether, if this had been done, the schooner would have escaped collision with the tow, unless the schooner had also altered her own course; but it would have afforded a chance of escape.

In going to port as and when she did, if the schooner committed any fault, it was a fault in extremis. The mate, who was in charge of the schooner's navigation, was an experienced seaman. He expected, as he had a right to do, until the contrary became manifest, that the steamship would change her course so as to pass on his starboard side, and not keep on across his bow. He had paid little attention to the steamship's tow, and had not apprehended danger until the vessels were so near together that risk of collision was imminent. When he was called on to decide what to do to escape, he acted upon a sudden judgment, exercised in the teeth of peril. As it turned out, his effort to cross the steamship's bow was perhaps the safer maneuver, as otherwise his vessel might not have cleared the tow. However this may be, if he made a mistake it was an excusable error, upon the principle that "when one ship has, by wrong maneuvers, placed another ship in a position of extreme danger, that other ship will not be held to blame if she has done something wrong, and has not been maneuvered with perfect skill and presence of mind."

We are unable to resist the conclusion that the collision was caused by inexcusable negligence on the part of the steamship in approaching too near the schooner before making the necessary maneuver to pass her safely. Her exculpation necessitated proving that the schooner showed a red light, when in fact she was showing a green light, and a theory of collision which is inexplicable, except by subjecting conjecture for testimony, and violent presumption for all the reasonable probabilities of the case.

The decrees are affirmed, with interest and costs.