THE MARGUERITE.

(District Court, D. Massachusetts. May 14, 1898.)

No. 749.

1. COLLISION—MANEUVERS UNDER PRESSURE OF EXTREME DANGER.
A vessel which has the right to be where she is should not be held to be in fault for an unwise maneuver made in a moment of extreme danger.

2. SAME—RIGHT OF WAY—SAILING VESSEL AND TUG WITH TOWS.
While the rule giving the right of way to sailing vessels as against steamers is based historically upon their assumed inferiority, it is nevertheless an arbitrary rule, which is not to be varied by any estimates which the navigators immediately concerned may make of the comparative maneuvering powers of their respective vessels. Therefore a tug with tows is bound to keep out of the way of a schooner, under ordinary circumstances, though it is manifest that the schooner can much more readily change her course.

3. SAME.
The rule giving a sailing vessel the right of way, as against a steamer, requires the steamer to keep off the course of the sailing vessel if it be practically possible to do so; that is, if she can do so without accident, such as collision with another vessel, running aground, or the like.

4. SAME—CHANGE OF COURSE BY SAILING VESSEL.
A sailing vessel approaching a tug with tows should hold her course, at all events until it becomes evident that the tug will persist in her breach of the rule by refusing to give way.

5. SAME—RIGHT OF WAY—SAILING VESSEL AND TUG WITH TOW.
A tug with tow, meeting a sailing vessel at night in a narrow channel, held not relieved of her obligation to keep out of the latter's way by the

fact that she had wind and tide with her, and that the sailing vessel was under full sail and in a position to maneuver easily.

Carver & Blodgett, for libelant.
W. H. Leonard, for respondent.

LOWELL, District Judge. This was a libel for the loss of the schooner Nickerson by collision with a scow towed by the steamtug Marguerite. The accident occurred October 25, 1895, at about half past 6 in the afternoon, a little below Castle Island, in Boston Harbor. There was a northwest wind, blowing 20 miles an hour or somewhat less, and the tide was about an hour ebb. The schooner, a fisherman of 90 tons, loaded with about 20 tons of fish, was returning from the banks. She was carrying mainsail, foresail, jib, and flying jib. She had a crew of 16 men, all told. Near buoy 6 she came about on the starboard tack, and stood across the channel. Having reached its southern edge, she came about on the port tack below buoy 7. As she was tacking, her captain, who was forward on the lookout with one or two other men, perceived the tug coming down the channel about half a mile away, with towing lights set. He did not see the tow or any lights upon it. Conceiving that the schooner had the right of way, he held his course on the port tack until a few moments before the collision, when he attempted to come about; but, before he could do so fully, the starboard corner of the scow struck the starboard bow of the schooner, making a hole so large that the schooner quickly sank.

The Marguerite was towing two loaded mud scows, lashed together end to end. The towing hawser was about 200 feet long, and the entire length of the tug and tow was something less than 500 feet. The tug's captain saw the schooner crossing the channel on the starboard tack, and from that time to the time of collision had her constantly in observation. He proceeded on the theory, developed by counsel in the argument before me, that the tug and tow had the right of way, and he did nothing to avoid the schooner until a few moments before the collision, when he shouted to her to tack, and slowed down or stopped the tug, thus slacking the hawser between it and the scow.

I find that both vessels had full view of each other for some time before the collision, though the lookout on the tug was sharper than that on the schooner. Until just before the collision, each vessel was maneuvered as if it had the right of way. If the tug should have given way to the schooner, the former was clearly to blame. If it was the duty of the schooner to avoid the tug and tow, the fault was wholly with the schooner. I should add that the testimony given by the captain of the tug seems to me to be, on the whole, more accurate than that of the schooner's crew, but concerning the facts above stated there is little or no conflict of evidence.

Before discussing the principal question presented by this case, viz. which vessel had the right of way, I must dispose of one or two subsidiary complaints made by each vessel of the other. The men on the schooner did not see any lights on the scows, but the evidence is conclusive that there was a white light on each scow from six to eight feet above the water. Not improbably, these lights were hidden

from the schooner by the tug. Libelant's counsel contends that these lights were not those required by rule 8, Rev. St. § 4233. Even though the lights were insufficient, I should have no difficulty in finding that, if the tug and tow had the right of way, it was in the highest degree negligent for the schooner to attempt to sail across the stern of the tug after having seen the tug's towing lights. If, on the other hand, the schooner had the right of way, the tug was in fault, even though there were proper lights upon the tow.

It is contended by those on the tug and tow that the helmsman of the schooner, just before the collision, put his helm to port for an instant, before finally putting it to starboard. I am inclined to think that this testimony arose from an error in observation. The captain of the tug testified that the schooner did not begin to sheer to starboard until she had gone half way from the tug to the first scow. This leaves less than 20 seconds for the schooner to have sheered to starboard, and then sheered to port, so as to oppose her starboard bow to the starboard corner of the scow. Even if the schooner's helm was put to port for an instant, I should have no difficulty in finding that the act was done in a moment of extreme danger, and that, if the schooner had the right to be where she then was, she ought not to be held in fault even if the maneuver was made inadvertently or was unwise. See Bigelow v. Nickerson, 17 C. C. A. 1, 70 Fed. 113, 122.

I have, therefore, to consider simply if the ordinary rule which gives to the sailing vessel the right of way did not apply under the peculiar circumstances of this case.

These circumstances are stated by the claimant's counsel substantially as follows: A tug descending a narrow channel with two scows (190 feet) at the end of a hawser (210 feet). Wind and tide behind her. The channel 1,000 to 1,200 feet wide. A small fishing schooner, with all sail set and wind enough to maneuver easily. The schooner about to enter the channel in the opposite direction to the tug and tow. As I understand it, the learned counsel's contention may be stated thus: The rule which gives the right of way to the sailing vessel is based upon the greater freedom of movement ordinarily belonging to the steamer. Hence it follows that when, in a given case, the sailing vessel has a manifest superiority, the rule becomes inapplicable for want of the reason upon which it is based, and the case is governed by rule 24. Doubtless the presumption of inferiority is always with the sailing vessel, and the steamer must affirmatively demonstrate her own inferiority; but, where the steamer's inferiority is both manifest and considerable, she has the right of way. This is, I think, the claimant's contention, stated fairly and strongly.

That the rule which gives the right of way to sailing vessels as against steamers is based historically upon the assumed inferiority of the former there can be no doubt. In some other cases, the rules give to one vessel the right of way as against another quite arbitrarily, and without any such historical reason. But a rule of navigation, whatever its origin, when once established, is an arbitrary rule, and this for an excellent reason. That the rules governing the conduct of vessels should be precisely determined is far more important than

that they should impose upon every vessel a burden of precisely the same weight. As soon as two vessels come within sight of each other, each should know just what it may expect of the other, that it may govern its own movements accordingly. The rules of navigation not infrequently put one vessel to a deviation which the justice of peculiar circumstances would impose upon another, but the hardship of this deviation is rightly deemed a small matter compared to the dangers in which uncertain rules of navigation would involve all vessels.

If, when a sailing vessel sights a steamer, she may not assume that the steamer will give way, but, before holding her own course, must first determine if she or the steamer has the superior ability to maneuver, the perils of navigation will be greatly increased. It is usually easy to distinguish a sailing vessel from a steamer, but the comparative ability of two vessels to maneuver may often remain undetermined until it has been passed upon by the final court of appeal; and, if it be contended that the right of way belongs to the steamer only if her inferiority is manifest in a high degree, the uncertainty is not much lessened. Each vessel must then determine not only which has the superior ability, but, if the superiority is with the sailing vessel, must also determine what is the degree of that superiority.

As has often been said, the right of way is not a right to sail where the privileged vessel chooses. The privileged vessel has its burdens, and the burdened vessel has its privileges. Under ordinary circumstances, the former, indeed, may hold her course; but she may leave that course only at her peril, and, on leaving it, she becomes, in her turn, the burdened vessel. On the other hand, the burdened vessel must leave open the course which the privileged vessel is holding; but, unlike the latter, she may go wherever else on the face of the waters she pleases, and, in every place not within the forbidden course, she, in her turn, is privileged. To cause a sailing vessel and a steamer to exchange privileges and burdens according to their individual ability to maneuver would induce disastrous confusion, and would afford no sure relief to the inferior vessel. A schooner which had come into collision with a steamer by an improper change of course would then be found contending that she was without fault because her superior ability made her the burdened vessel, and thus imposed upon the steamer, as the privileged vessel, the duty of holding her own course.

The need of absolute certainty in rules of navigation has often been declared. In The Oregon, 18 How. 570, 572, it is said:

"Practically, when a rule for this purpose is laid down, it is rendered ineffectual by admitting exceptions to it. The mind begins to waiver as soon as the danger arises, and the exception, rather than the rule, becomes a subject of solicitude with the masters of both boats, and this, practically, annuls the rule, and causes the movements of both vessels to be uncertain."

See Belden v. Chase, 150 U. S. 674, 699, 14 Sup. Ct. 264.

It is difficult to make a general statement which shall apply to all cases, but it seems to me that the rules require a steamer to keep off the course of a sailing vessel if it is practically possible for the steamer to do so; that is to say, if she can do so without accident, such as collision with another vessel, running aground, or the like.

The reason and the limits of this qualification of the rule are both apparent. If the steamer cannot keep off the course of the sailing vessel, obviously there will be a collision unless the sailing vessel gives way. If the steamer came into its original position without fault, it cannot be held in fault for a collision which no subsequent action by it could have avoided. On the other hand, if the steamer's inability to keep off the course of the sailing vessel be seasonably apparent to the latter, there is no injustice in holding the latter to blame for the collision, if she, in her turn, could have avoided it. In case of the manifest inability of the steamer to give way, therefore, and in that case only, does she have the right of way over a sailing vessel. This general rule, and this exception thereto, seem to me just, and as safe and as easy of application as the nature of the case permits.

The rule is well illustrated by the case at bar. When the schooner first sighted the tug the former was coming about upon the port tack. At that time nothing was visible to those on the schooner but the green light and the towing lights of a steamer. That the schooner actually had the superior maneuvering ability I have no doubt, but the superiority was not then evident to those aboard of her. If my interpretation of the rules of navigation be correct, she had nothing to do but to hold her course, at all events until it became evident that the steamer would persist in her breach of the rules. When this became evident, the schooner should have given way, though her failure to do so would in no way relieve the steamer from fault. If, on the other hand, the claimant has correctly interpreted the rules of navigation, those in charge of the schooner and of the tug, as the vessels approached each other, should have devoted themselves to an estimation of the comparative maneuvering abilities of their several vessels under the existing conditions of wind, tide, and locality, and, if at any time the schooner appeared to be decidedly the superior of the steamer, should have treated the latter as having the right of way. If, practicing this altruism, each of these two vessels, instead of claiming the right of way, had yielded it to the other, and if a collision had ensued, as the natural result of the mutual forbearance, this court, on the claimant's theory, would have had to pass upon the relative ability of the schooner and the tug, with each vessel seeking to establish its own superiority and to fix the right of way upon its opponent.

It may be said that the letter of the rules bears hardly upon tows, which have become a most important means of coastwise commerce, —more important, perhaps, than sailing vessels. To this argument the answer is obvious. If the rules are unjust,—that is to say, if they put the burden upon what is ordinarily the inferior vessel,—the legislature should change them, but, until the change is made, the court will bear in mind that public safety is less endangered by the injustice of the rules than by their uncertainty. Certainty is the primary requirement of rules of navigation; the requirement of fairness is only secondary.

The decided cases, including those cited by the claimant and those cited by the libelant, support the principles just set out.

In The M. W. Page, 36 Fed. 329, the schooner which was held in fault was fickle, and brought about the collision by an unreasonable change of course. It is doubtful, moreover, if the tug and tow could have changed their course so as to avoid the collision, without running into a third vessel. It was daylight, and the situation was plain to the schooner. The dicta in the opinion, indeed, go somewhat beyond the decision, and seem to allow to a long tow certain rights which the circuit court of appeals of this circuit has denied to it. The Gladiator, 25 C. C. A. 32, 79 Fed. 445; The Mount Hope, 29 C. C. A. 365, 84 Fed. 910.

In The Rose Culkin, 52 Fed. 328, the schooner changed her course improperly. Here again the dicta go beyond the decision.

The case of The A. P. Cranmer, 1 Fed. 255, cited in The Rose Culkin, holds that a tug and tow are not a steamer within the rules, and upon this point has been overruled. The Civilta, 103 U. S. 699. And see The Harold, 84 Fed. 698. It is true that the judgment of the district court was affirmed on appeal, but the affirmance was upon another ground. 8 Fed. 523.

In The Minnie C. Taylor, 52 Fed. 323, the tug and tow could not turn to starboard without striking a third vessel, and could not turn to port without running aground. To stop the tug, and thus allow the barges to huddle together, would hardly have been safe. The case was very close to the line of distinction, and the learned judge, though he seems to have held that the tug and tow had the right of way, yet found that the tug, also, was in fault. The Philadelphian, 10 C. C. A. 127, 61 Fed. 862, was a case in which the sailing vessel did not sail out her tack.

In The Excelsior v. The Bruce, 38 Fed. 271, the tug and tow and the sailing vessel, as in this case, held their courses until collision was probable, if not inevitable, when the latter made an unsuccessful attempt to tack. It was held that the tug was to blame, and the learned judge said:

"The allegation that the bark should have gone about earlier, or should have turned southward, and endeavored to go astern of the tow, finds no support in the facts of the case. Her tack was not run out by several hundred yards. She had a right, therefore, to hold her course, and it was her duty to do so until threatened with collision, and then it was proper to make the effort which she did to avoid the danger." "Was the tug in fault? I believe she was. It was her plain duty to go astern of the bark. There was nothing, I think, in the way of her doing so. It seems quite evident that she desired to avoid loss of time by change of course, and therefore took the risk of crossing the bark's bows, hoping to get by in time. She took the chances, and must bear the consequences. Had there been anything in the way of turning slightly eastward to go astern, when she saw the bark turn westward, she should have slowed down, and stopped, if necessary. The use of her anchors and those of the ship would have enabled her to do this with safety."

In The Howard Carroll, 41 Fed. 159, a tug and tow were held in fault for a collision with a schooner beating up East river, and it was said:

"In this case the sailing vessel was beating in a narrow channel, where, in order to do anything to avoid the tow, it would be necessary for her to shorten her tack." "Instead of taking means to avoid the sailing vessel, as she ought

to have done, the tug took and maintained her course, upon the chance that the sailing vessel would know her intention and break her tack upon being signaled by the tug. But if the tug was not able, through lack of power, to control the float, she was nevertheless in fault; for the safety of the harbor requires that the tugs which undertake to tow the large floats should be of sufficient power to handle their floats easily and properly, and able to avoid sailing vessels when they are met in the course of their navigation about the harbor."

See, also, The Maverick, 28 C. C. A. 562, 84 Fed. 906.

In The George S. Shultz, 28 C. C. A. 476, 84 Fed. 508, it was held that an unincumbered steamer, making 14 miles an hour, had the right of way as against a tug and tow in narrow waters and in broad daylight, when the steamer had the tug on her port hand. In that case the rule which required the tug to give way was purely arbitrary in its origin.

I am of opinion, therefore, that the schooner had the right of way, and that the tug should have avoided her by porting her helm, and passing her to the southward, or by slowing down, or by some other means. That the tug could have avoided the schooner, if she had tried to do so, seems clear. I do not think that she need have anchored, as was suggested in The Excelsior.

Although the tug was thus in fault, I have further to determine if the schooner did not contribute to the accident by holding her port tack as long as she did. At some time it should have become plain to those on board her that the tug meant to hold its course, and that a tack on the schooner's part was the only way of avoiding a collision. However clear may have been the schooner's right of way, yet she had no right wantonly to run into another vessel, however blameworthy. But it must be observed that the schooner could tack only by disregarding the ordinary rules of navigation, and by taking upon herself all the risks of this disregard. Had she done so, and had the tug changed her own course to starboard at the same time, the former would have been held liable for the collision which would have ensued. That the court should hold a vessel in fault for assuming that an approaching vessel will be properly navigated, and for not taking the risks of disregarding the ordinary rules, the case must be very plain, at all events where the complaining party is the vessel whose improper navigation was the real cause of the accident. As things turned out, the Marguerite might well have tacked a minute sooner; but I do not think that the tug, which made no signal to indicate that she intended to transgress the ordinary rule of navigation, can complain of the delay. In The Excelsior the sailing vessel seems to have persisted in her tack as long as in the case at bar, and that in broad daylight, when the danger of a change would have been less.

In The Delaware, 161 U. S. 459, 468, 469, 16 Sup. Ct. 516, 521, there is a discussion of the duty, under certain circumstances, of the privileged vessel to avoid the burdened vessel. "The weight of English, and perhaps of American authorities," it is said, "is to the effect that, if the master of the preferred steamer has any reason to believe that the other will not take measures to keep out of her way, he may treat this as a 'special circumstance,' under rule 24, 'rendering a departure' from the rules 'necessary to avoid immediate danger.' Some even go

so far as to hold it the duty of the preferred vessel to stop and reverse, when a continuance upon her course involves an apparent danger of collision. Upon the other hand, other authorities hold that the master of the preferred steamer ought not to be embarrassed by doubts as to his duty, and, unless the two vessels be in extremis, he is bound to hold to his course and speed."

The cases of The Britannia, 153 U. S. 130, 14 Sup. Ct. 795, and The Northfield, 154 U. S. 639, 14 Sup. Ct. 1184, must be regarded, however, as settling the law that the preferred steamer will not be held in fault for maintaining her course and speed, so long as it is possible for the other to avoid her by porting, at least in the absence of some distinct indication that she is about to fail in her duty. If the master of the preferred steamer were at liberty to speculate upon the possibility, or even upon the probability, of the approaching steamer failing to do her duty and keep out of his way, the certainty that the former vessel will hold her course, upon which the latter has a right to rely, and which it is the very object of the rule to insure, would give place in the mind of the master of the obligated steamer to doubts whether she would do so or not, and would produce a timidity and feebleness of action on the part of both masters which would bring about more collisions than it would prevent. Belden v. Chase, 150 U. S. 674, 14 Sup. Ct. 264; The Highgate, 62 Law T. (N. S.) 841; 6 Asp. 512. See, also, The Isaac Newton, 18 How. 581; The Oregon, 158 U. S. 186, 202, 15 Sup. Ct. 804; The Maggie J. Smith, 123 U. S. 349, 355, 8 Sup. Ct. 159; The Bywell Castle, 4 Prob. Div. 219; The Warrior, L. R. 3 Adm. & Ecc. 553; The American, L. R. 6 P. C. 127.

In The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 216, it is said:

"Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is of itself sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption, at least, adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of the other vessel should be resolved in its favor." "The evidence of contributing negligence on the part of the sailing vessel should be clear and convincing."

In the case at bar the evidence of contributory negligence on the part of the Nickerson seems to me far from conclusive. For the reasons mentioned I find that the neglect of the rules by the Marguerite was the sole cause of the collision. Decree for libelant.