THE DEVONIAN.

(District Court, D. Massachusetts. July 15, 1901.)

No. 1,233.

1. COLLISION—STEAM AND SAILING VESSELS—DUTY OF STEAMER.

While the statutory rule requiring a steam vessel to keep off the course of a sailing vessel is modified where the steamer cannot obey it without serious peril to herself or other vessels, she is not justified in disobeying it until she has resorted to all other practicable means, not only to escape the danger after it is known, but to anticipate and provide against it.

**2. SAME—STEAMSHIP IN NARROW CHANNEL.**

A large steamship entering Boston Harbor accompanied by a tug, owing to her draught, was obliged to pass through a narrow channel, some 2,000 to 2,500 feet in length, in which she could not well maneuver. The weather was fair, with a light wind, and there were a number of sailing vessels anchored to the south of the channel. When partly through, a schooner was seen coming from among the anchored vessels on a course which crossed the channel. The steamer's engines were reversed, and the tug was sent ahead, but did not succeed in getting the schooner out of the way, and, owing to the lightness of the wind, she was drifted by the ebb tide against the bow of the steamer and injured. *Held* that, conceding that the steamer was the privileged vessel, owing to the narrowness of the channel, the claiming of such peculiar privilege imposed on her the duty, under the circumstances, of taking the precaution of sending the tug ahead to give warning before she entered the channel, and that because of the failure to take such precaution, as well as of improper steering, and other errors in navigation, she was liable for the damage to the schooner.

**3. SAME—CONTRIBUTING FAULT—FAILURE TO MAINTAIN LOOKOUT.**

The fact that a schooner kept her course up to the time of a collision with a steamer does not excuse her failure to maintain a proper lookout, since she is not under all circumstances justified in keeping her course, and such failure will be deemed a contributory fault, notwithstanding her privilege and the fault of the steamer, where if such lookout had been maintained the collision might probably have been avoided by prudent navigation.

In Admiralty. Suit for collision.

Carver & Blodgett, for libelant.

Lewis S. Dabney and Frederic Cunningham, for claimant.

LOWELL, District Judge. This was a collision between the English steamer Devonian, on a voyage from Liverpool to Boston, and the three-masted schooner Perry, proceeding from Boston to Rockport. It occurred on April 29, 1901, at about 10:20 a. m. The weather was clear, the water smooth, the wind light from the southeast. The place was between buoys 9 and 11 in Boston Harbor, the tide not quite half ebb, and running about a knot and a half. The Perry was 122 feet long, drawing 9 feet without her center board, and about 15 feet with it. The Devonian was 570 feet long over all, and drew nearly 24 feet. As the schooner kept her course, the steamer was at fault unless special circumstances be shown.

The steamer's theory of the collision is this: She was coming up the harbor, slowly stopping from time to time to let vessels pass. Just below the Gas buoy she stopped to let a tug and tow go by. Then she started, and at the Gas buoy entered a passage very narrow for vessels of her size. The original ship channel at this place is of considerable width, but there were dredges and drill scows placed near its middle by the United States government, in order to deepen it. The steamer could not pass safely except to the south of the dredges and scows, and so the passage, as indicated by temporary buoys, was no more than from 300 to 500 feet wide. The length of this narrow passage was from 2,000 to 2,500 feet. Just as the steamer had entered upon it, passing the Gas buoy, those on board her perceived the schooner coming out on the south side of the channel, from a fleet of vessels moored there with sails hoisted. Imme-

diately the engines were stopped, and immediately afterwards were reversed. A tug in attendance on the steamer was sent ahead, to get the schooner out of the way. The tug failed to do this, and, as the vessels approached, the steamer's starboard anchor was let go. The reversed engines of the steamer were throwing the steamer's head to starboard and her stern to port, until the latter almost took ground on the south side of the channel. The steamer's bow passed over the chain, so that the anchor's hold was on the port side of the steamer. The steamer was brought to a stop by the anchor and reversed engines, just as the schooner, moving very slowly through the water, and drifting with the tide, struck broadside amidships against the steamer's stem. The steamer immediately went ahead, to keep its stern clear of the flats on the south side of the channel, thus deepening the cut in the schooner's side. Soon afterwards the schooner was hauled out of the way by the tug. As soon as the schooner was seen on the starboard tack, the tug started ahead, hailing the schooner to drop her anchor. When the tug came nearer, a heaving line was thrown, which reached the schooner, but to which, through the clumsiness or indifference of those on the schooner, no hawser was attached, so that the tug could not carry out its intention of hauling the schooner backwards. Nothing was done on the schooner until the last moment, when the helm was put up without effect, owing to the lightness of the wind. The steamer claims to bring itself within the opinion rendered by this court in the case of The Marguerite (D. C.) 87 Fed. 953, 956, 957:

"The rules require a steamer to keep off the course of a sailing vessel if it is practically possible for the steamer to do so; that is to say, if she can do so without accident, such as collision with another vessel, running aground, or the like. * * * In case of the manifest inability of the steamer to give way, therefore, and in that case only, does she have the right of way over a sailing vessel."

Even if we assume, as the steamer contends, that, after the schooner was seen, neither the steamer nor the tug could have done anything more to avoid the collision, we must still ask, ought not the steamer to have done something else before seeing the schooner? It was approaching a narrow passage, from which it could not back out,—a passage which sailing vessels were likely to cross, and in which on that morning they could not readily maneuver, owing to the lightness of the wind. If its size and the dangerous narrowness of the channel gave to the steamer peculiar privileges, as I think was the case, they imposed upon it peculiar duties. If it had the right of way in that passage against a sailing vessel properly warned, there was the greater need of giving the fullest possible warning. That a sailing vessel might at any moment emerge from the anchored fleet was manifestly possible. That there would be danger if this happened was plain. To guard against this danger was easy. A steamer, which is ordinarily bound to avoid a sailing vessel, ought not to enter upon a narrow passage, where it cannot avoid a sailing vessel, and where a sailing vessel very probably cannot avoid it, until it has done its best to ascertain that the passage is and will remain clear. The steamer might have waited below the Gas buoy until the

tug had gone ahead, and made proper report. Had this precaution been taken, the collision would not have happened. Doubtless a steamer is not ordinarily required to be preceded by a tug, even when maneuvering in a crowded harbor, but where such peculiar privileges are claimed as here, there is no injustice in the requirement. That the attendance of a tug in some capacity was needed, those on the steamer appear to have recognized. Captain Brittain said: "We have a contract to escort these ships and convey [convoy?] them up and down the harbor." Again, there is no doubt that the steamer was going much more than two and one-half knots over the ground when the Gas buoy was passed. Mr. Crosby, an intelligent and disinterested witness, estimated the speed at from four to five knots. Even if the collision took place but 1,300 feet from the Gas buoy,—the lowest place given by any witness,—and even if six minutes were taken in covering the distance,—the longest estimate,— the average of the steamer was over two knots; and this, if she was stopped at the time of the collision, would imply a speed of about four knots at the beginning. In fact, I think the collision was several hundred feet higher up. It is not clear that from four to five knots over the ground—say six knots through the water—is too high a speed at which to pass the Gas buoy, if proper care be taken that the channel above shall remain clear. Under these circumstances, a less speed might even be undesirable, but this considerable speed emphasizes the danger of attempting to pass the channel until after more complete warning than was given here. Again, there is contradiction between Captain Muir and the pilot regarding the orders given on the steamer just before the collision. The former testified that the engines were not started ahead until after the collision; the latter directly to the contrary. "The schooner kept approaching. I stopped the engine in the meantime, and the schooner was coming right across our bow, and was falling off. When she was coming across the ship's bow, and a minute before she touched, I stopped the ship's engines, and sung out, 'Hard a-starboard,' and then, 'Full speed ahead.' The ship's stern was getting onto the mud, and I had to go ahead with the ship. I was afraid of being hung up with these dredges, and so I gave the order 'Full speed ahead.' The ship started ahead. Then I sung out to let go the anchor, which was done, and after the chain took her, and the ship straightened out, I sang out, 'Get a rope over the schooner's bow, and turn her out from under our bow.' As soon as the rope was fast, I stopped the engines. The ship had not gathered much headway. The tug was pulling the schooner away, and when she was pulled away the engines were started, and then we proceeded further up the harbor."

It is true that the pilot testified that the steamer was not moving at the time of the collision, but, if her engines had been going full speed ahead for a minute, or even for half a minute, I do not think the steamer could have been absolutely stationary. Mr. Crosby says she was not. Perhaps she had been stopped by her anchor before she was started ahead, and the pilot's observation may have been made at that time. This order of the pilot was doubtless given in extremis, but it not only discredits the testimony of Captain Muir

and others, but illustrates the danger of the whole proceeding on the steamer's part, and the wisdom of sending a tug ahead to give warning of the steamer's approach. As was said by the circuit court of appeals for the Sixth circuit in Squires v. Parker, 42 C. C. A. 51, 53, 101 Fed. 843, 845:

"We concede that, as urged by counsel for the respondent, the governing rule is modified when the steamer cannot obey it without getting into serious peril, and there is no other way to avoid it but to disregard the rule. The Marguerite, 87 Fed. 953. But in such case it is obvious that the steamer is bound to resort to all other practicable means before she can be justified in violating the statutory regulation."

Again, the helmsman of the steamer testifies that he put the steamer's wheel hard a-port before the collision, and with him agrees the statement of Captain Muir. Apparently this maneuver was improper, as, if the steamer's head had been only a little more to port, the collision would not have happened. Still, again, if the hole in the schooner's side was deepened by the steamer going ahead after the collision, and if the necessity for the steamer's going ahead was caused by its bow being to starboard, then increased damage may have been caused by improper steering. As other faults have been found on the part of the steamer, it is not necessary to discuss this question further.

The court has next to consider if the schooner also was at fault. She had no lookout. Her counsel contended that the want of a lookout did not contribute to the collision; that she kept her course, and that this was her only duty; but the privileged vessel has no right to keep her course with her eyes shut. The rule requiring a lookout is imposed alike upon the burdened and privileged vessel. The duty of the privileged vessel is to hold her course; the duty of the burdened vessel is to keep off that course. But the privileged vessel is to hold her course, constantly observing the burdened vessel, in order to notice if the latter fails in her duty. When the failure of the burdened vessel becomes apparent, the privileged vessel must change her course as prudence commands. If she thereafter keeps her course by reason of failure to observe the fault of the burdened vessel, she is at fault. Want of watchfulness on the part of the privileged vessel does not altogether excuse the burdened vessel, but it is none the less a fault. In this case the schooner saw the steamer when the former was on the port tack. The schooner then knew that the steamer was large, and would have difficulty in maneuvering in the narrow passage it must shortly enter. The schooner ought not to have lost sight of the steamer, especially while tacking in an anchored fleet, and considering her own slight maneuvering power. Yet, after losing sight of the steamer, the captain of the schooner did not again notice her until his attention was attracted by the tug's whistle. The want of a lookout was a plain fault, which probably contributed to the accident. It is at least doubtful if the schooner could have anchored in time to do any good. Perhaps the failure to catch the tug's rope was a mere accident, though the whole conduct of those on the schooner savors of negligence amounting almost to recklessness. As both vessels were at fault, the damages must be divided.