## UNITED STATES v. DELAWARE BAY AND RIVER PILOTS' ASS'N.

## THE PHILADELPHIA.

### No. 4262.

Circuit Court of Appeals, Third Circuit.
Oct. 8, 1930.

Rehearing Denied Dec. 6, 1930.

WOOLLEY, Circuit Judge, dissenting.

Calvin S. Boyer, Acting U. S. Atty., and Charles Denby, Jr., Asst. U. S. Atty., both of Philadelphia, Pa., and J. Frank Staley, of Washington, D. C., for the United States.

Lewis, Adler & Laws, of Philadelphia, Pa. (Otto Wolff, Jr., of Philadelphia, Pa., of counsel), for appellees.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and THOMSON, District Judge.

THOMSON, District Judge.

This is an appeal from a final decree of the District Court for the Eastern District of Pennsylvania, wherein the learned judge dismissed the libel of the United States, owner of submarine L–1, against the pilot boat Philadelphia. The case arose out of a collision between the submarine, en route from Norfolk Navy Yard to the Philadelphia Yard, and the pilot boat Philadelphia.

The collision occurred at 2:50 a. m. on February 2, 1921, in the Delaware Bay just inside of Overfalls Lightship, with the weather clear, sky overcast, wind northeast, and tide flood. The libel was filed on August 1, 1923, damages in the sum of $31,000 being claimed. After hearing in open court, the District Judge filed an opinion dismissing the libel. In the opinion of the court below, the case turned on a single question of fact, namely, whether the port light on the subma-

rine was showing red or white at the time of the collision.

The judge based his opinion largely on the testimony of Bennett, the pilot, who was awaiting his turn to pilot an incoming vessel. The substance of Bennett's testimony was that shortly after 2 o'clock, when he went on watch in the pilot house, the pilot boat was not under way, but lying dead in the water a little more than two miles inside the Overfalls Lightship. That at that time, the pilot boat was headed southeast by south, and the lightship bore a point off her port bow, about southeast. That a few minutes after he went on watch, Bennett saw a faint white light about a point and a half or two points, on his starboard bow. Shortly afterwards he saw another white light close to the first, the two lights appearing to him to be range lights of a vessel, and the fact that the lower of the two lights was to his right, he concluded that the vessel was showing her starboard side and was steering in direction which would cause her to pass the pilot boat on the latter's starboard. From the fact that he was unable to see any side lights, he concluded that the vessel was at least two miles away. He thought it was a vessel coming in, which would require a pilot. He went below and called Chambers, who is now dead, the pilot next in turn, and returned himself to the pilot house. He then signaled the engine room to start the vessel ahead slowly, which was done, making about six knots. He told the wheelsman, at the same time, to keep the approaching lights a point or a point and a half on his starboard bow, which orders were obeyed. Bennett then called Captain Kelley, the commander of the pilot boat, who, up to that time, was in his cabin just back of the pilot house. The pilot boat proceeded at the same speed without further orders, keeping the lights a point to a point and a half on the starboard bow. A few minutes after she started, a faint green light, Bennett says, appeared close to the white light, which confirmed his view that the approaching vessel was showing her starboard side and also that she was a considerable distance away.

The pilot boat continued her course, and about two minutes later, struck the hull of the submarine, whose lights were those which had been observed, the blow being at right angles at a point some twenty to thirty feet back of the submarine's bridge. After the collision, Bennett says he observed the lights of the submarine as she lay near the pilot boat. He says she carried three navigation lights; one, the masthead light high upon the fore port of the steamer, with side lights on either side of the superstructure, about two feet behind the masthead light, and two or three feet below it. He claims that the starboard side light showed green, and that the port side light, instead of showing red, showed white, so that any one seeing the submarine at a distance from any point on her port bow, saw two white lights, the masthead light and the port side light, which would be below it and to the right. If the latter showed white, the lights might be mistaken for the starboard view of the range lights of an approaching vessel, and it is claimed that the apparent absence of any side lights would give the further impression that the vessel was quite a distance away, as the observer would expect to see a green starboard light, if the vessel had come within a distance of two miles.

From this it is concluded that the improper showing of a white light, instead of a red light on the port side, was the cause of the collision, and that the pilot boat was without fault. This is the conclusion the court reached, after a consideration of the facts of the case.

The position of the libelant was very different. It is claimed that the logbook of the submarine accords in every detail with the facts, as testified to by its commander, Lieut. Cochran, then in charge of the navigation. The substance of this logbook is as follows:

"Proceeded on course 15 degrees true at 12:15; passed Fenwick Island Light, a beam, 200 yards distance; changed course to 330 degrees true; at 2:00, changed course to right and steered various courses, standing toward Overfalls Light Ship; at 2:30 passed the Light Ship on starboard beam at 200 yards away. Started to change course to 336 degrees but saw light of pilot boat one point on port bow. She carried the following lights, high white light, with red light below; below these and to the left, powerful white light; steadied on course 340. Began easing to the right, using 5 degrees right rudder. Suddenly saw green light to the right of the powerful white light; ship loomed up at about four points on port bow about 100 yards away. Gave full right rudder. At 2:50 our vessel was struck with great force on the port quarter. Stopped both engines and sounded short blasts on whistles. Started both main pumps. Pilot boat stood by and took submarine in tow for inner harbor."

The report by the master of the pilot boat, filed as required by law within two days of the collision, read:

"Beg to advise that while I was Captain of the pilot boat 'Philadelphia,' the following collision occurred off Delaware Cape. About 2:30 in the morning on February 2nd, 1921, we saw a vessel approaching, which proved to be the submarine L–1; the 'Philadelphia' at this time was headed in a southeasterly direction, which showed her starboard light to the submarine, and she in turn showed her starboard light to the 'Philadelphia.' When the vessels were getting very close together, the submarine, without any warning, proceeded directly across her bow, and although we ordered the pilot boat's engines astern at full speed, a collision occurred."

Nothing in this report indicated that the port red light showed white. No mention was made of any trouble with the lights, the collision apparently being caused by the submarine's proceeding directly across the bow of the pilot boat without any warning whatever.

The preliminary article of both the inland and international rules provides: "Risk of collision can, when circumstances permit, be ascertained by carefully watching the compass bearing of an approaching vessel. If the bearing does not appreciably change, such risk should be deemed to exist."

Pilot Rule No 7 provides: "When two steam vessels are approaching each other at right angles or obliquely, so as to involve risk of collision, the steam vessel which has the other on her port side, shall hold her course and speed; and the steam vessel which has the other on her own starboard side, shall keep out of the way of the other by directing her course to starboard, so as to cross the stern of the other steam vessel or, if necessary to do so, slacken her speed or stop or reverse. If from any other cause the conditions covered by this situation, are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall at once be made apparent by blowing the danger signal, and both steam vessels shall be stopped and backed if necessary, until signals for passing with safety are made and understood."

Under the pilot boat's own story, she had up navigation lights of a vessel under way. She was under the duty of maintaining a regular sea watch which should have consisted of a navigating officer in the pilot house, the quartermaster at the wheel, an experienced and efficient lookout properly stationed on deck, and a ship's engineer on watch in charge of the engines. The engineer of the pilot boat was not called as a witness, nor the engine log produced, and nothing is shown as to what occurred in the engine room. The lookout on deck was an apprentice pilot of three months' experience only, who admittedly made no report of the green light of the submarine when he first saw it. The pilot boat had no ship's navigating officer on watch. Bennett, at watch in the pilot house, was waiting his turn to act as pilot on an inbound ship. Neither the mate nor the master of the pilot boat was on watch. Bennett says he went on watch shortly after 2 o'clock. He states from memory, after eight years, that the pilot boat was heading about southeast by south with the lightship about a point on its port bow. The lights of the submarine were first observed approaching about a point and a half from his starboard bow. This would seem impossible if the course taken by the submarine, 200 yards off the lightship, is correct. One white light on the submarine was first observed about ten minutes before the collision, and later two white lights appeared. Upon seeing the lights, the pilot told the wheelsman to keep the approaching vessel a point or a point and a half on his starboard bow. This would be what is called a constant bearing. The course of the submarine could not be definitely determined without observing the continuous compass bearing of the approaching vessel. The pilot did not look at his compass (see Record, p. 201). In this situation, with the submarine approaching, Bennett, assuming the duties of a navigator, after having given directions to the wheelsman to keep the vessel on a steady bearing, leaves the pilot house with only a wheelsman and the apprentice on the lookout deck, and goes to the lower deck into the lighted cabin to arouse Chambers as the next pilot to board an incoming vessel; leaving the lighted cabin, Chambers went to the pilot house, the master was not called.

It is said in Wilder's Steamship Company v. Low (C. C. A.) 112 F. 161, 172: "For an officer to leave his vessel entirely without a lookout, especially when another vessel is known to be in the vicinity, is culpable negligence, and approaches very nearly the line of reckless navigation."

If this is true of the lookout, it is more conspicuously true of a deck officer in leaving his station and going below. Being the officer in charge of the deck, the duty rested on Bennett, as the lights of an approaching vessel were in view, not only not to leave the pilot house, but to watch his compass, noticing the bearing of the approaching vessel and keeping under constant observance the lights of

that vessel. In this case, he not only did not stand his station in the pilot house, but admits he did not look at the compass to determine the direction of the approaching vessel. In this situation, he leaves the darkened pilot house, goes into a lighted cabin, returns to the darkened pilot house, where the eye must be slowly accustomed to the darkness. In going below, he became unacquainted with any movement made by the wheelsman, or in any changes in the heading of the pilot boat or in any change in the ranges of the white lights which he claims to have observed. It would also appear that if an officer in charge of the navigation of a vessel had observed the position of the range lights, he would have concluded that the course of the submarine could not have been what Bennett believed it was. On a merchant vessel, the white lights are on the mast in the center line of the vessel, the higher of the two being in the rear. The course of the vessel is known to an approaching vessel by the way the white lights line up. On a submarine, the high white light is a little forward of the side lights and the red light is the lower. If the red light showed white, the position of those lights to the pilot boat would indicate that the submarine was heading westward. If any doubt existed, with the aid of the compass bearings, it would have been definitely apparent for some time before the collision that something must be wrong with the submarine lights; otherwise, the angle of the range lights would not indicate a vessel moving to the westward, when in fact she was pursuing a northeast course. In this situation, failure to notice the compass bearing, to determine the course, assuming the red light was white, appears clearly to have been a fault. It might also be stated that the order given by Bennett (Record, p. 200) to keep the approaching lights on a steady bearing, not only invited, but almost necessarily resulted in, a collision. It is said in The Maverick (C. C. A.) 84 F. 906, 908: "It is a familiar proposition that if, while two vessels are approaching, there is no appreciable change in the bearing of a light from the other vessel, there is risk of collision; and the result of nautical experience has been formulated as a rule of navigation in article 16 of the act of 1890 to prevent collisions at sea."

When the pilot boat admittedly was at all times keeping the submarine on the same bearing, she puts her engines ahead and proceeds with an admitted speed of six knots, making collision almost inevitable. The pilot, Chambers, was called on deck to go on the incoming vessel as a pilot and assume charge of the navigation. He is without knowledge of the facts relating to the prior movements of the approaching vessel, the course pursued by the pilot boat, or the change in the range lights of the submarine or the compass bearings of his own vessel. In ignorance of these facts, the collision happens a short time after Chambers took charge. The testimony of the wheelsman is not taken, and the record is silent as to exactly what he did when the pilot was below. Captain Kelley came into the pilot house just before the collision, but his testimony is not before the court, he having died in 1926. Though the pilot vessel's logbook was demanded, it was not produced, nor was its non-production sufficiently accounted for at the time of the trial. From such failure to produce the logs, an inference of fault naturally arises. The report of the facts of the collision, made a day or two after the occurrence, gives a different account from that now attempted to be established. There, apparently, the collision was due to the fact that the submarine suddenly crossed the bow of the pilot boat, no mention being made of the red light showing white.

Aside from the question of whether the red light showed red or white, the officers of the pilot boat were clearly mistaken in three particulars:

1. The course of the submarine was northeastward, and not westward, as the pilot boat supposed.

2. The submarine, instead of being at a distance of two miles away, was dangerously near the pilot boat.

3. She was not an in-coming vessel in need of a pilot, as was assumed.

These three errors of fact, coupled with the dereliction of the navigation of the pilot boat, naturally led to the collision which followed.

As the respondents' case was rested by the court on the single finding that the submarine's port light was showing white instead of red, and that this was the cause of the collision, such fact should very clearly appear in the testimony. The only witnesses for the respondent having knowledge of the facts before the collision, and who have testified, are Bennett, the pilot, and the lookout, an apprenticed pilot of three months' experience. The court's finding is based largely on the testimony of Bennett, but his testimony is squarely in conflict with other competent witnesses. The navigating officer of the subma-

rine, Payton H. Cochran, who was on watch on the bridge from a quarter of twelve to the time of the accident, testifies that the lights were near him, that he had every opportunity to observe them, and says the lights were burning brightly; the red light having a perfectly normal red color. Immediately after the collision, he says he saw the lights and they were in the same condition. To the same general effect is the testimony of Robert P. Luker, Lieutenant Commander, United States Navy. He was commanding officer during the period in question, and says the light at all times showed red on the port side and green on the starboard side. He says that the port light was a distinctive red light and that it was in that condition just after the collision. Holbrook Gibson, a United States Navy Commander, was called and went aboard the submarine, perhaps the night of the day following the collision, and he says that he observed the lights and that the red light was burning very brightly, showing a distinct red.

We will not stop to argue in detail the evidence on the opposite sides of this controverted fact upon which the learned court below based his finding. It is sufficient to say that the evidence fails to convince us that the red light showed white and that this failure caused the collision which resulted. On the other hand, we are of the opinion that the faults of navigation on the part of the pilot boat, which we have hereinbefore referred to, were the direct, and as we believe the sole, cause of the unfortunate collision. So finding, the decree of the court below must be reversed.

WOOLLEY, Circuit Judge, dissents.